## Word v. Commonwealth.

(Decided January 15, 1913.)

### Appeal from Christian Circuit Court.

1. Homicide—Prosecution for Murder—Evidence.—In a prosecution for murder, where defendant was convicted of voluntary manslaughter, evidence examined, and held, that the verdict of the jury was not flagrantly against the evidence.

2.  Homicide—Prosecution for Murder—Threats by Defendant to Kill Person Other Than Deceased—Evidence—Admission.—On a trial for murder, it was error to admit evidence of specific threats by the defendant against the life of a person other than the deceased.

3.  Homicide—Prosecution for Murder—Evidence—Collateral Matter—Conclusiveness—Impeachment of Witness.—It is not competent to cross-examine a witness as to any distinct collateral matter not brought out in the examination in chief, with a view of impeaching his testimony by introducing other witnesses to contradict him. If a question as to such collateral matter be put to a witness with the intention to discredit his testimony, his answer must be taken as conclusive, and no evidence can be afterwards adduced to contradict him.

G. W. SOUTHALL & SON, and C. H. BUSH, for appellant.

JAMES GARNETT, Attorney-General, and D. O. MYATT, Assistant Attorney-General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COM-MISSIONER—Reversing.

About April 1, 1910, the defendant, Bud Word, shot and killed one Ed White in Christian County, Kentucky. He was indicted for murder and convicted of voluntary manslaughter. From the judgment of conviction he appeals.

The grounds relied upon for reversal are: (1) The verdict is flagrantly against the evidence; and (2) the admission of improper evidence.

The homicide occurred on the Princeton pike a few miles from Hopkinsville. The deceased, Ed White, in company with one Fred Shipp, was going out the pike about seven o'clock in the evening. He met the defendant, Bud Word, in company with his brother, Vernon Word. Fred Shipp, the only eye-witness introduced by the Commonwealth, says that he and White met the two Words, who were going in the direction of the city of Hopkinsville. In passing, they greeted each other in the usual way. He and Ed White started on, when the defendant said: "Mr. Ed, I would like to have that little change you owe me." White said: "How much is it?" Defendant said: "I think it is fifty cents." White handed defendant the fifty cents, and in doing so dropped some money on the ground. He and White began to hunt for a match to look for the money. Thereupon, defendant turned around and said: "Look here, Ed White, G—d d—n it, I am tired of you fooling with me." Defendant then shot at White. White then turned and

started towards defendant, who fired two more shots. The last shot took effect, producing almost instant death. White never got to defendant, but, when he was shot, staggered back across the road and fell into the arms of witness. White had no weapon on him, but did have a bottle of beer in each hip pocket. Witness says he was not drunk, but had had a couple of drinks. He had also sent a quart of whiskey on before him. Witness also stated that the shooting occurred in the middle of the road; that neither White nor defendant was in the ditch on the side of the road at the time of the altercation. After the killing, they carried the body of White across the ditch, but this was some distance from where the shooting took place. Witness denied stating before the coroner's jury that defendant asked White for a dollar and a half, and also denied making the statement that the defendant shot at White three times while White was going the other way with his back turned towards him. John Woodson testified that he was in a saloon in Hopkinsville when White and the defendant were present. He heard the defendant say: ''I am going to see that girl, and I am going to marry her, and it is no d—n man's business about it.'' White said that he didn't have anything to do with it; that he had left the family. Defendant then went into a back room with White and said: ''I am going to kill some d—n son-of-a-bitch about that girl yet.'' Witness claims that this conversation took place about four weeks before the killing. On cross-examination, however, he was unable to say in what month the killing took place, but said that it took place in the spring of the year 1912. Jennie White, Ed White's wife, testified that she had a daughter by the name of Maude Tandy, by a former husband. At one time, the defendant was going to see her daughter. This occurred in July, 1911. Defendant never showed any anger toward Ed White in any way about Maude. Witness further stated that she had to have Bud Word arrested because he came there for Maude, and said that he wanted to kill her, and she also stated that Ed White was not there. On cross-examination, she stated that defendant told her that he had nothing against Ed White. She also stated that defendant called to see her daughter for about two months and a half. Walker Irvin testified that defendant told him that Ed White had forbidden defendant to come to the house, but that he was going

when he got ready. On one occasion he was present at the house of Ed White when defendant came there and called for the girl. She told him she couldn't go because her mother couldn't go. Defendant said: "I don't care nothing about what you say; I don't care nothing about nobody on this place, neither white nor black. If you are going to do what I say do, you must do as I tell you to do." She said: "I can't go because Aunt Jennie won't go, and I can't go." Defendant said: "You will have to go. I don't care a d——n for nobody on the place, neither white nor black." This conversation took place at Ed White's house when Ed was present. Maude Tandy testified that she was 19 years of age, and was the daughter of Jennie White. The defendant had not been to her house since Christmas. She occasionally, however, met him in town. At the time of the killing, and for some time prior thereto, she and the defendant had not spoken. Defendant never said anything to her about White. She thought White and he were good friends. Witness was permitted to state, over the objection of the defendant, that defendant said that he was going to kill her. After this she herself had him arrested. On cross-examination, this witness stated that she was not the daughter of Ed White. Ed and her mother had not lived together since the previous year. Ed White never had anything to do with her or exercised any control over her. Will Moore testified that about six weeks prior to the killing, he was in a barber shop in Hopkinsville and heard defendant say he was going to kill the two sons of bitches that had him arrested. On the next day, he heard him say that he would not be satisfied until he killed the son of a bitch who objected to his going to the house to see this girl, meaning Maude Tandy. He says that this latter conversation took place in the presence of Thuston Dillard and several others.

The evidence for the defense is as follows:

Defendant says that he and his brother, Vernon, met Ed White and Fred Shipp. Ed had a bottle of beer in each hip pocket, and was under the influence of liquor. Fred Shipp was also drunk, and had a quart of liquor with him, which he exhibited. He and Vernon, when they met White and Shipp, were greeted with oaths and called vile names. No attention was paid to this. Defendant remarked to White that he would like to have the fifty cents that White owed him. White replied that he had no

fifty cents. Defendant then told him that he could pay it the next week. Thereupon, White pitched him a fifty-cent piece, which defendant caught on the back of his sleeve. White, at the same time, told defendant that if he ever breathed or said anything to him any more, he would kill him. Defendant assured him that he meant no harm about the fifty cents. Just then White put his hand on his hip pocket and told defendant to get on down the road or he would kill him. Defendant says that he saw his gun glittering in his pocket, and turned and walked away. His brother was standing nearer to White, and also took the beer bottle in White's pocket to be a pistol. Vernon then told defendant to come on. White followed defendant and accused him of "norating it around that he wouldn't pay his debts," and also telling that he was a married man. White then told the defendant he had to fight it out, cut it out or shoot it out. White then threw off his overcoat and rushed on defendant, striking him and knocking him backwards in the ditch on the side of the road. After striking defendant, White put his hand in his pocket, and made a demonstration as if to draw a pistol. Defendant then drew his pistol and shot White. In the scuffle, White took defendant's pistol away from him. Defendant says that the only reason he shot White was because he thought from White's threats and actions that White was going to kill him. The defendant's testimony is corroborated in all essential particulars by the evidence of his brother Vernon. Bailey Wagner testified to finding the body of Ed White on the right hand side of the road. Thuston Dillard denied being present when Will Moore claimed that defendant stated that he was going to kill the son of a bitch who had him arrested. C. W. Jones, a white man, and member of the coroner's jury which held the inquest on the body of White, says that Fred Shipp testified before the coroner's jury, and that Fred was very drunk. He also stated that Shipp testified before the coroner's jury that defendant demanded a dollar and a half, which he claimed White owed him; that White paid him the dollar and a half and started on; that defendant shot White while White was going in the other direction. John Shepard (white) testified that he saw Fred Shipp on the night of the homicide, and that Fred Shipp was pretty full. When he went to the scene of the homicide witness found the body of Ed White

on the left going to Hopkinsville. This witness also gives the same account of Fred Shipp's testimony before the coroner's jury as given by C. W. Jones. Walter Cornelius also testified that Fred Shipp testified before the coroner's jury that defendant asked White for a dollar and a half, which White paid him, and that defendant shot White while he was going in the other direction. John C. King, the stenographer who took down the testimony at the coroner's inquest, testified to certain discrepancies between the testimony of Will Moore given on the inquest and that given at the trial. Other witnesses testified for defendant, but their testimony is not very material.

After the defendant closed, Jennie White was recalled by the Commonwealth, and permitted to testify, over the objection of the defendant, that Thuston Dillard came to her on one occasion and told her that her husband had better watch out, as But Word was mad at Maude and at Ed. After witness also said that Thuston Dillard told her that Bud was a dangerous fellow, the court admonished the jury not to consider the testimony of Jennie White as substantial proof against the defendant, but only for the purpose of impeaching the testimony of Thuston Dillard, if it did impeach him.

It will be seen that on the one hand we have the evidence of Fred Shipp that the homicide was entirely unprovoked, and that the defendant was in no danger at all when he killed the deceased. In addition to this, there is evidence showing that defendant had been arrested, and certain facts and circumstances tending to show that he believed that the deceased was responsible for his arrest. Coupled with this evidence, is evidence of threats against the person who had him arrested. On the other hand, the evidence for the defendant tends to show that he believed, and had reasonable grounds to believe, that he was in danger of death or great bodily harm at the hands of the deceased at the time he killed the deceased; that he had not previously threatened the deceased, but, on the contrary, no feeling existed between them. While it is true that the prosecuting witness, Fred Shipp, is shown by the defendant to have been drunk at the time of the homicide, and to have made contradictory statements in regard to the homicide, it must be remembered that the only witnesses who testified for the defense with reference to the homicide are the defendant himself and

his brother. It is the well settled rule that the credibility of a witness is for the jury, and considering the evidence in the light of Shipp's testimony, as well as defendant's previous hostility and threats against the deceased, in connection with the fact that the defendant's side is mostly supported by his and his brother's testimony, we cannot say that the verdict of the jury is flagrantly against the evidence.

We are of the opinion, however, that the trial court erred in permitting Jennie White and Maude Tandy to testify that the defendant threatened to kill Maude Tandy. With this evidence before them, the jury may have concluded that as the defendant threatened to kill Maude Tandy, the probability was that he not only threatened to kill, but did kill, the deceased on account of Maude Tandy. It was, of course, proper to show that defendant had been going to see Maude Tandy, and that he had been arrested, and any facts or circumstances tending to show that the defendant believed that Ed White was responsible for his arrest, and therefore any threats directed at the person who had him arrested. These facts go to show motive, and have a direct bearing on the plea of self defense. Defendant may have been willing and anxious to kill Maude Tandy, and yet may not have entertained the same hostility towards the deceased. Therefore, specific threats directed toward her alone are not admissible for the purpose of proving defendant's hostility toward the deceased.

Another ground urged for reversal is that the Commonwealth was permitted to impeach Thuston Dillard on a collateral matter. When Dillard was on the stand he was asked, on cross-examination by the Commonwealth, if he had not gone to Jennie White and told her that her husband had better watch out, for Bud Word was mad at Maude and Ed. The witness answered no. This matter was not gone into on the direct examination. Jennie White was subsequently recalled and permitted to testify that the witness Dillard had made the statement to her. It is not competent to cross-examine a witness as to any distinct collateral fact not brought out in the examination in chief, with a view of impeaching his testimony by introducing other witnesses to contradict him. If a question as to such collateral fact be put to a witness with the intention to discredit his testimony, his answer must be taken as conclusive, and no evidence can be afterwards

adduced to contradict him. Kennedy v. Commonwealth, 14 Bush, 340; Loving v. Commonwealth, 80 Ky., 507; Crittenden v. Commonwealth, 82 Ky., 164; Hayden v. Commonwealth, 140 Ky., 634. Manifestly whether Dillard made the statement or not, it was entirely collateral to the issue, and when he denied having made the statement, the Commonwealth was concluded by his answer, and had no right to show by Jennie White that he had made the statement.

In view of the fact that the weight of the evidence in other respects is in favor of the defendant, we are inclined to the opinion that defendant's substantial rights were prejudiced by the error of the court in admitting evidence that the defendant had threatened to kill Maude Tandy, and permitting the Commonwealth to get before the jury the fact that Thuston Dillard had told Jennie White that her husband had better watch out, for Bud was mad at Maude and Ed.

Judgment reversed and cause remanded for new trial consistent with this opinion.