**James Foster JONES, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Supreme Court of Kentucky.

Dec. 9, 1977.

G. Murray Turner, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., Carl Miller, Asst. Atty. Gen., Frankfort, for appellee.

CLAYTON, Justice.

James Foster Jones appeals from a judgment sentencing him to 30 years' imprisonment for the March 5, 1976, murder of Burt Grubbs, whose death resulted from a blow at the base of his skull. The facts of the case are basically as follows.

Jones and Lee Etta Hahn were married in 1970; in January of 1975 they were divorced. For a time after the divorce, Lee Etta lived alone. As her resources dwindled, however, she moved into the home of the 78-year-old Grubbs, a friend of her family for several years. This arrangement upset Jones greatly—so much, in fact, that he threatened to shoot Grubbs and burn his house if Lee Etta remained. This threat caused Grubbs, on January 16, 1976, to file a complaint with the police department. On January 20, a warrant was issued for Jones' arrest, charging him with terroristic threatening. The warrant was served on the morning of March 5, the day of the killing.

In the meantime, Lee Etta, due to Jones' threat, left Grubbs' house and moved back in with Jones. Lee Etta resided with Jones for a few weeks, after which time she moved into the home of her bedfast mother. Also living in her mother's house were Louise Glasgow, Lee Etta's sister, and James Kenneth Glasgow, Louise's only son, who was fathered by Mr. Grubbs when Louise was 15.

On the morning of March 5, Lee Etta and Louise left their mother under the care of Grubbs and went their separate ways, Lee Etta to her place of employment and Louise to do some errands. Louise returned around noon, only to find the glass to the back door broken out and Grubbs lying dead on the kitchen floor, his head in a pool of blood. A check of her mother's room revealed that her mother was safe. On the bed beside the elderly lady lay a blood-stained hammer; Jones stood by the foot of the bed. According to Louise, when she saw Jones there, she said, "Aren't you ashamed to do an old man like you did him," to which Jones replied, "No."

Jones, testifying in his own behalf, neither admitted nor denied killing Grubbs. According to Jones, he simply could not remember everything that had occurred on that day. He did remember that he had been drinking heavily the night before and that he consumed additional liquor on the morning of the killing. Jones further remembered that he had gone to the Glasgow home to ask why Grubbs caused the warrant to be served on him. When he arrived there, Jones noticed that the back door glass was broken. He went inside, drank a half-pint of whiskey, and threw the bottle into the stove. The next thing he remembered was seeing Grubbs' body on the floor and a hammer lying nearby. Jones then testified that he picked up the hammer and went to the mother's room to see if she was all right. When he found that she was safe, he told her what had happened and she suggested that he lay the hammer on the bed. Jones could not remember anything that happened after this time until he awakened the next day in jail.

Jones' initial contention on appeal is that the trial court erred by admitting testimony about the fact that Grubbs was responsible for the issuance of the arrest warrant for terroristic threatening which had been served on the day of the killing. Had this warrant been issued upon the complaint of anyone other than the victim, it would, of course, have been improper to allow such testimony. Because it was Grubbs who brought these accusations to bear on Jones, however, the testimony was competent to show the state of feeling which existed between Jones and Grubbs and to establish a motive for the killing. *Scott v. Commonwealth*, Ky., 495 S.W.2d 800 (1972); *Powell v. Commonwealth*, 308 Ky. 467, 214 S.W.2d 1002 (1948); *Word v. Commonwealth*, 151 Ky. 527, 152 S.W. 556 (1913). Thus, the trial court acted correctly by allowing this testimony into evidence.

The trial court did err in permitting, over defense counsel's objection, testimony relating to specific acts of violence and threats made by Jones against third parties. During direct examination by the Commonwealth, Lee Etta Hahn was allowed to testify as follows:

Q Could you, I know this is rather prying, but could you tell us the reason why you divorced James Foster Jones?

A Well, he just drank and gambled, and he was cruel to me and beat me a number of times. I just figured I'd be better off by myself if I had to be treated that way. I could do better by myself.

Q Did he ever threaten you?

A Yes sir. He has beaten me several times . . .

. . . . .

Q You say the defendant here has threatened you before; he has threatened Mr. Grubbs before, in your presence?

A Yes sir.

Q What did he say to you—if you didn't get out of Grubbs's house?

A He was going to kill me.

Q Have there been any other occasions where he has really threatened your life?

A Well, he's beat me nearly to death several times.

Following this testimony, James Kenneth Glasgow was also permitted to testify about threats on his life which he had received from Jones.

It has long been the rule in this jurisdiction that while a threat to kill or injure someone which is couched in vague terms and directed at no one person in particular is admissible in a homicide prosecution to show a hostility towards mankind in general and hence towards the deceased, a threat to kill or injure someone which is specifically directed at some individual other than the deceased is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection. *Burden v. Commonwealth*, 296 Ky. 553, 178 S.W.2d 1 (1944); *Fugate v. Commonwealth*, 202 Ky. 509, 260 S.W. 338 (1924); *Word, supra*. In the instant case, the threats and acts of violence were specifically directed at Lee Etta and James Kenneth; they in no way demonstrated hostility on Jones' part toward Grubbs or the world in general. Consequently, their admission was error.

Jones' next assignment of error is that the trial court erred by allowing into evidence a confession made by Jones to the police following his arrest, without first determining whether it was voluntarily uttered.

Immediately after Louise discovered Jones in her mother's room, she called the police. Jones was subsequently arrested and placed in a police car, where he was interrogated by Detective Bobby Shanks of the homicide division. After advising Jones of his *Miranda* rights, Detective Shanks asked Jones to relate what had occurred at the Glasgow home. According to Shanks, Jones made the following statement which was recorded by Shanks on a "voluntary waiver form" and signed by Jones:

The way it happened is I married Lee Etta Hahn. James Kenneth and Louise had Lee Etta move in with her granddaddy and I told Lee Etta a long time ago that I would kill that son of a bitch if he ever got in a car with her. I got to the house, Grandma, and Granddaddy was there and I kill that son of a bitch with a hammer. I busted the door with a hammer. I come to kill James Kenneth or Louise but they weren't there. This son of a bitch was there in the spot. They had Lee Etta move in the house with him. I bought [sic] the hammer with me. I walked here. I only know the guy's name by Granddaddy. He's James Kenneth's Daddy.

Prior to trial, defense counsel moved to suppress this confession on the ground that it was not voluntarily given, and requested that the trial court conduct an in-chambers hearing on the matter. The trial court refused to hold such a hearing, however, stating that it could just as easily determine whether the confession was voluntary or not at that point during the trial when the Commonwealth sought to introduce the statement into evidence. When that time arrived, defense counsel renewed his motion to suppress and again asked for a hearing; but the trial court denied the motion and admitted the confession.

In *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the United States Supreme Court held that before a confession may be constitutionally used as evidence against a criminally accused, the voluntariness of that confession must, if the accused so requests, be determined by someone other than the convicting jury.

In *Bradley v. Commonwealth*, Ky., 439 S.W.2d 61 (1969), we made this rule a bit more precise as applied in this jurisdiction by stating that the someone who must determine the voluntariness issue must be the trial judge and that this determination must be made at an in-chambers hearing outside the presence of the convicting jury.

The reasons for requiring an in-chambers hearing on the issue of voluntariness are at least threefold. As a practical matter, if the trial court should wait to make its determination until the confession is offered at trial, then conclude that the confession was in fact coerced or otherwise involuntarily uttered, "the cat is already out of the bag." The jury has already heard the incompetent and highly damaging statement, making the declaration of a mistrial the only proper remedy. If the trial court should determine the confession to be involuntary after conducting an in-chambers hearing, however, the trial can proceed sans confession, saving the time and expense of a new trial. Moreover, a determination of voluntariness based solely on the evidence presented at trial may be a determination based on less than all of the available relevant evidence; for the accused may be hesitant to testify on the issue of voluntariness at trial due to fear of impeachment by proof of prior convictions and of extensive cross-examination in front of the jury that is to decide his fate. *See Jackson, supra,* 84 S.Ct. at 1787, n. 16. Finally, if the defense counsel moves to suppress, and an in-chambers hearing is held, prior to trial, the trial court will be able to make its determination uninfluenced by evidence pertaining to the truth or falsity of the confession.

In the case at hand, the refusal by the trial court to conduct a *Bradley*-type hearing was plainly error. Although the Commonwealth concedes this to be so, it contends that Jones' conviction should nevertheless be affirmed, resting its argument on *Henderson v. Commonwealth*, Ky., 507 S.W.2d 454 (1974), wherein we declined, in the absence of a showing of prejudice, to overturn the appellant's conviction despite a similar failure to follow the procedural requirements set forth in *Bradley*.

Unlike in *Henderson*, however, there is in the present record on appeal some indication that Jones' confession might have been involuntary in nature. It was developed at trial that Jones possessed only a fourth-grade education and that he could not read. In addition, there was a great deal of testimony that Jones was highly intoxicated at the time he made his confession to the police: Jones himself said he was so drunk

he couldn't even remember talking to the police; each of the policemen who came in contact with Jones testified that he was obviously intoxicated; and Lee Etta Hahn stated that Jones' signature at the end of the voluntary statement form looked like the way Jones signed his name when he was drunk.

All of these things—lack of education, illiteracy, and intoxication—are factors which can, under certain circumstances, cause an otherwise valid confession to be suppressed for want of voluntariness. *See Allee v. Commonwealth*, Ky., 454 S.W.2d 336 (1970); *Britt v. Commonwealth*, Ky., 512 S.W.2d 496 (1974). This is a sufficient showing of prejudice. The record need not contain conclusive proof that Jones' confession was in fact involuntary, but need only reflect enough evidence to demonstrate the existence of a genuine issue on the matter.

In light of this conclusion, there is no need to consider, insofar as it relates to the merits of the case, Jones' further contention that the trial court also erred by refusing to submit the question of voluntariness to the jury. *See Bradley, supra.* For such a refusal can only constitute error when a proper determination of this question has already been made by the trial court. Had the trial court in fact allowed defense counsel to carry this issue to the jury without first holding an in-chambers hearing on the matter, it would have been engaging in the very procedure condemned in the *Jackson* case.

This is not to suggest, however, that the raising of this contention at trial or on appeal was in vain, since the fact that Jones sought a jury determination on the question of voluntariness does have a bearing on the ultimate disposition of this case. If Jones' sole request at trial had been for an in-chambers hearing on this question, we could have simply remanded the case to the trial court for such a hearing with directions that a new trial be granted only if it should be decided that Jones' confession was involuntary. *See Jackson, supra.* Because Jones also requested that the question be submitted to the jury, however, we find it to be in the interest of judicial economy to grant Jones a new trial now. Were we to instead remand for a hearing, a new trial would eventually be required in any event: if the confession were found to be involuntary, its admission into evidence would constitute error; if the confession were found to be voluntary, the failure to submit the question of voluntariness to the jury would constitute error.

We have carefully reviewed Jones' other assignments of error, but find them to be without merit.

The judgment is reversed, and the cause is remanded for a new trial.

All concur.