**Tolman HENSON, Jr., Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 90-SC-647-MR.**

Supreme Court of Kentucky.

July 3, 1991.

William R. Jones, Appellate Public Advocate, Highland Heights, for appellant.

Frederic J. Cowan, Atty. Gen., E.M. Lowery, Asst. Atty. Gen., Criminal Appellate Div., Frankfort, for appellee.

SPAIN, Justice.

Appellant, age forty-four and disabled, appeals as a matter of right his conviction of murder and first-degree manslaughter, for which he received a concurrent sentence of imprisonment of twenty and fifteen years, respectively.

Tolman Henson, Jr., had spent the afternoon of June 10, 1989, with his family and friends drinking whiskey and beer, while target practicing in the front yard of his residence, which was located near the city of Manchester in Clay County, Kentucky. At some time before dark, Carl Bruce Bowling, appellant's nephew, began "scuffling" or "fighting" with Carl Mills. The altercation ceased between the two, but thereafter Bruce's brother, Jackie, began to fight with Mills. Tolman interceded and told the boys to stop because he did not allow fighting at his home. Randy Henson, appellant's son, testified that Jackie then grabbed appellant and threw him over his head and onto the ground. Bruce and appellant then went to an apple tree, located in the front yard of the Henson home, to retrieve a thirty caliber carbine rifle which appellant had previously leaned against the tree. Bruce reached for the rifle but it was taken from his hands by Tolman. Bruce testified at trial that appellant had pointed the rifle at him, whereupon his brother, Jackie, had intervened and accused Tolman of pointing the weapon at him. Bruce, in a taped statement made one day after the shooting, was asked by a state police detective whether "... your brother told Junior [Tolman] you better kill me," whereupon he had replied, "Yeah, he said, if you don't kill me after you laid the gun on me, he said if you don't kill me said I'll kill you." Randy in his statement to the police, stated that Jackie said, "Man, if you pull that gun on me, you'd better use it." Bruce then stated that he and appellant's two teenage daughters fled the scene, walking down the road away from the house. Appellant's wife also left the scene by exiting through the rear of the house and into the hills.

Randy, who was not drinking alcohol that afternoon, tried to convince Jackie that his father had not pointed the rifle at him. Unable to convince Jackie, the following confrontation occurred between the appellant and Jackie, according to Randy's testimony:

> So they started cussing, the Bowling boy did and the old man started backing up; said I am too old to fight you; said I don't want no trouble out of you and he walked toward old man a little bit and old man shot in under his foot and I said old man give me the gun; I said I don't want no trouble; I said it's my gun, I said let me have it; old man reached me the gun. I had both hands on the gun and he was reaching it like this; he had one hand ahold of the gun and the Bowling boy started toward him again; he

jerked the gun out of my hand and the Bowling boy said have you got the guts to shoot me old man and my father said Jackie said I don't want to do nothing; said don't make me do something I don't want to do and old man said don't call me a son-of-a bitch no more and uh—they was standing there arguing a little bit and then Jack looked up, Jackie Ray Bowling and said if you don't shoot me before I get to my gun you are a dead man and old man shot him right through there and I was standing right beside of him about from here to that right there and I said Oh Lord and it just tore me all to pieces and he turned around looking at me; the Bowling boy did and said Randy said take me to the doctor; he's shot me and he shot him again right through here; he was standing there a looking at me; he shot him right through there and he started falling instantly just about it and I grabbed around him. (T.E., pp. 198–199.)

Appellant then saw Carl Mills grab Jackie's twenty-two caliber rifle from the front porch of the house and begin to run towards the back of the house. Appellant ran around the other side of the house and then shot Mills through the chin as Mills was turning to look over his shoulder. Appellant testified at trial that "If he hadn't a turned around I'd a probably shot him in the back." When asked why he had shot Jackie, appellant had stated that, "Well I knowed, I knowed I would have to kill him or him me one cause I knowed him; I raised him; I raised him and Carl Bruce both all their lives." When asked whether he was scared, Tolman replied, "Yeah, I was scared cause I knowed he would kill you...."

Tolman then walked to his car and left the scene. Appellant encountered his daughters walking on the road, picked them up, and took them to their grandfather's house. Thereafter, Tolman hid in the bushes until he decided to surrender to the Kentucky State Police in London, Kentucky.

The state police investigated the shooting and took recorded statements from the appellant and all the other witnesses present at the Henson residence within twenty-four hours of the shooting. Detective Thomas McKnight testified that he found the body of Bowling in the front yard of the residence near the apple tree. The body of Mills was found at the rear of the home lying on a twenty-two caliber rifle. McKnight testified that he took pictures of the premises and of the victims' bodies. Trooper Walker testified that he made a drawing of the scene of the crime and took measurements of various items and bodies in relation to each other. Walker testified that he found a spent thirty caliber shell casing approximately eleven feet from the body of Mills at the rear of the house. Two spent thirty caliber cartridges were found only six feet from the body of Bowling. These were the only shells found in the immediate vicinity of the victims.

An autopsy was performed on the bodies of the victims. Dr. John Hunsaker, a forensic pathologist, testified that he found two gunshot wounds on the body of Bowling, both of which went through the body. One gunshot wound was located below and behind the right ear. The bullet track went straight through Bowling's spinal cord which, according to Hunsaker, would have caused Bowling to immediately collapse or become "dead weight." The second wound penetrated Bowling's chest and punctured his lung. There was minimal bruising found on Jackie's body. A postmortem toxicology report indicated that Jackie had a .19 blood alcohol level at the time of his death.

Bruising was found on the body of Mills which indicated to the pathologist that Mills had either taken a relatively minor beating or was not defending himself. A single gunshot wound was located on Mills's chin. The bullet track traveled in a straight line from right to left and slightly upwards and then exited through the neck. A postmortem toxicology report on Mills indicated that he had a .27 blood alcohol level at the time of his death.

Appellant was indicted and tried on two counts of murder. He testified on his own behalf and admitted that he shot and killed

Bowling and Mills but claimed that he was acting in self-defense and under the influence of extreme emotional disturbance. The jury returned its verdict finding appellant guilty of first-degree manslaughter in the death of Bowling and guilty of murder in the death of Mills.

■ Appellant's first claim of error on his direct appeal is that the trial court improperly admitted prejudicial testimony. Specifically, appellant objects to the admission of a statement that appellant would have killed his wife had she been there. At trial, both Freda Henson and Ollie Henson Mills, appellant's daughters, testified that their father had picked them up while they were walking along the side of a road after the shooting had occurred. On direct examination by the prosecutor, Freda Henson was asked whether her father had said anything, whereupon she replied that, "He said he had already killed two one was underneath the apple tree and the other one was in the back yard and he asked where Mommy was and we said she was supposed to be at the house and he said no, if she was I'd a killed her." Defense counsel made a general objection to this testimony after the statement was made but was overruled by the trial court.

Ollie Henson Mills was recalled by the Commonwealth on redirect examination and asked what her father had said when he had encountered her and her sister on the side of the road. She stated that "He asked me, he said where is the old woman at and I said she is supposed to be at the house Daddy; I runned off before my mother did and he said no she wasn't or I'd a killed her." Trial counsel objected to the statement prior to her answering the question, but was overruled by the trial court.

Appellant argues that these statements that he would have killed his wife were irrelevant and inadmissible in a homicide case. *Jones v. Commonwealth*, Ky., 560 S.W.2d 810 (1977); *Burden v. Commonwealth*, 296 Ky. 553, 178 S.W.2d 1 (1944); *Adams v. Commonwealth*, 274 Ky. 714, 120 S.W.2d 237 (1938). The Commonwealth responds that the statements are admissible as showing the state of mind of the defendant.

■ We believe that appellant's reliance upon *Jones* is misplaced. In *Jones*, a witness was allowed to testify over the objection of counsel that defendant had previously threatened to kill her if she did not move out of the victim's house. In holding that this testimony amounted to reversible error, we restated the long-held rule in this jurisdiction that testimony relating to specific acts of violence and threats made by the defendant against third parties is inadmissible.

It has long been the rule in this jurisdiction that while a threat to kill or injure someone which is couched in vague terms and directed at no one person in particular is admissible in a homicide prosecution to show a hostility towards mankind in general and hence toward the deceased, a threat to kill or injure someone which is specifically directed at some individual other than the deceased is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection. *Jones, supra*, at 812, citing *Burden v. Commonwealth*, Ky., 296 Ky. 553, 178 S.W.2d 1 (1944); *Fugate v. Commonwealth*, 202 Ky. 509, 260 S.W. 338 (1924); *Word, supra* [*Word v. Commonwealth*, 151 Ky. 527, 152 S.W. 556 (1913)].

However, in this case, there was *no threat to kill* made in the presence of appellant's wife or anyone else, nor did she testify at trial that her husband had threatened to kill her. The statement by appellant of what he would have done had his wife been present was made in the presence of appellant's daughters. The daughters were properly allowed by the trial court in its discretion to repeat to the jury what their father had said on that night immediately after he had shot and killed two men. The testimony went to prove the appellant's state of mind on the night of the shooting and was admissible as tending to prove the element of intent in the crime of murder. KRS 507.020(1)(a); *Wilson v. Commonwealth*, Ky., 601 S.W.2d 280 (1980); *Matthews v. Commonwealth*, Ky.,

709 S.W.2d 414 (1986), *cert. denied,* 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1986). Appellant's statement that he would have killed his wife if she had been there demonstrated the "ugly frame of mind" of a man in a killing mood, even though the statement was made after the homicides, because of the close proximity of time between the statement and the killings. The trial court did not abuse its discretion when it permitted the introduction of the disputed testimonial evidence. *Pendleton v. Commonwealth,* Ky., 685 S.W.2d 549 (1985).

■ Appellant's next claim of error is that the trial court failed to properly instruct the jury on his defense of self-protection. It is the contention of the appellant that the instruction was more restrictive than the language of the statute, KRS 503.050(1).

The court instructed the jury separately on each count of murder. The jury was given instructions on murder, first-degree manslaughter, second-degree manslaughter, reckless homicide, defense of others, and self-protection. In the self-protection instruction, the trial court used the words "... if he believed that Carl Mills was *then and there* about to use physical force" instead of the statutory language of *"use or imminent use* of unlawful physical force." (Emphasis added.) Trial counsel objected to the use of the language "then and there about to" claiming that this language was more restrictive than the statute. His objection was overruled by the trial court.

We believe the instruction on self-protection was proper and not overly restrictive. There is no significant difference in the use of the phrase "then and there about to" and the statutory language. Both phrases connote an immediacy or close proximity in time during which the defendant was allowed under the circumstances to use physical force. The self-protection instructions were comprehensive and easily understood by the jury. The appellant was not prejudiced by the wording of the instruction. The trial court did not abuse its discretion. *Pendleton, supra.*

Appellant's final claim of error also fails. Henson claims that he was prejudiced, and that reversible error occurred, when various witnesses were allowed to testify after they had been present in the courtroom listening to the testimony from the first two state police investigators and the forensic pathologist. Appellant also claims that his motion for mistrial should have been granted by the trial court. Trial counsel had requested a sequestration of witnesses prior to the voir dire of the jury. RCr 9.48. However, the witnesses came back into the courtroom after the lunch break and listened to the testimony of the aforementioned investigators before their presence was discovered. Trial counsel made a motion for mistrial and an alternative motion to exclude the testimony of the witnesses who had been listening while sitting in the courtroom. The trial court held an informal hearing outside of the hearing of the jury and determined that the witnesses had not been fully aware that they were to be excluded during the entire trial and further found from the record that the evidence which was heard by the sequestered witnesses would not influence their testimony, nor would their presence in the courtroom be prejudicial to the defendant below.

■ RCr 9.48 allows any party to request the trial court to "... exclude from the ... trial any witness of the adverse party not at the time under examination, so that he may not hear testimony of the other witnesses." "While RCr 9.48, dealing with the separation of witnesses, is not mandatory, we are of the opinion that once the trial court puts the rule into effect it is binding upon the parties, subject, of course, to the discretion of the trial court as to whether a particular violation has been prejudicial." *Rice v. Commonwealth,* Ky., 387 S.W.2d 4, 6–7 (1965). (Citation omitted.) A trial court abuses it discretion when it automatically precludes a witness from testifying without first considering whether the violation of the separation rule would be prejudicial under the facts and circumstances of the case. *Jones v. Commonwealth,* Ky., 623 S.W.2d 226, 227

(1981). "The failure of counsel to enforce the rule is but one factor to be considered in the proper exercise of discretion by the trial court under RCr 9.48." *Id.* A hearing is required by a trial judge to determine whether the violation caused prejudice to the defendant in addition to determining what the witness had heard or the content of his proposed testimony. *Ballard v. Commonwealth*, Ky., 743 S.W.2d 21 (1988). The record indicates that the trial court determined that the testimony inadvertently heard by the witnesses in the courtroom did not influence their testimony, and an examination of the record indicates that the trial court did not abuse its discretion. *Ballard, supra; Jones, supra; Rice, supra; Pendleton, supra.*

The decision of the Clay Circuit Court is affirmed.

All concur.