Jeffrey D. McGAHA, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2012–SC–000155–MR.

Supreme Court of Kentucky.

June 20, 2013.

As Modified Sept. 26, 2013.

W. Currie Milliken, Wesley Vernon Milliken, Bowling Green, KY, for appellant.

Jack Conway, Attorney General, Jeffrey Allan Cross, Assistant Attorney General, for appellee.

Opinion of the Court by Justice VENTERS.

Appellant, Jeffrey D. McGaha, appeals from a judgment of the Adair Circuit Court convicting him of murder and sentencing him to twenty years' imprisonment. Appellant makes these arguments in support of reversing his conviction: (1) one of the jurors failed to disclose during *voir dire* that she was a Facebook "friend" of the victim's wife; (2) the jury improperly considered penalty issues during the guilt phase deliberations; and (3) that on four separate occasions, the trial court improperly excluded evidence relevant to Appellant's belief that his use of force in self-defense was necessary. For the reasons stated below, we affirm the Judgment of the Adair Circuit Court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant and the victim, Mike Cowan, were neighbors in a rural part of Adair County. The evidence presented at trial by the Commonwealth indicated that the relationship between Appellant and Cowan was marred by a series of disputes. The most recent difficulty was over a light on Appellant's storage building that shone onto Cowan's property and annoyed him. Cowan retaliated by shining spotlights at Appellant's residence. On the evening before the fatal incident, Appellant complained to the police about the spotlights. When police officers arrived at the scene in response to that complaint, Cowan and his wife became belligerent. They were arrested and taken to jail.

The following afternoon, after his release from jail, Cowan visited a neighbor's residence on his ATV. As Cowan returned home, Appellant, driving in his car, saw him and steered directly into his ATV without braking. The impact knocked Cowan off the ATV. As a result of the blow from Appellant's vehicle, Cowan suffered severe blunt force trauma which alone would have been fatal. After the collision, however, while Cowan was lying on the ground, Appellant approached him and de-

livered a second fatal injury by shooting him in the head with a shotgun.

Appellant was indicted for murder. At trial, Appellant admitted that he killed Cowan, but claimed that he was acting in self-defense. In support of that claim, Appellant presented evidence of Cowan's threats, harassment, and intimidation directed toward Appellant and members of his household. Appellant also alleged that shortly before the fatal incident, Cowan had pointed a gun at Appellant and gestured, as if he was pretending to shoot at Appellant. Appellant saw Cowan place the gun on his ATV, and ride it over to the neighbor's residence. Appellant testified that he followed Cowan to speak with him, and that he took his shotgun for protection. Appellant said that when he encountered Cowan on his ATV, Cowan aimed his gun at Appellant. Fearing that he would be shot, Appellant drove his car into Cowan's ATV. After the collision, Appellant claims he got out of his car with his shotgun, and demanded that Cowan show his hands. According to Appellant, Cowan then said, "I'm still going to fucking kill you." Believing that Cowan was reaching for his gun, Appellant shot him in the head.

The jury, rejecting Appellant's self-defense claim, convicted him of murder and recommended a sentence of twenty years' imprisonment. The trial court entered final judgment consistent with the jury's verdict and sentencing recommendation. Appellant's post-judgment motions for judgment notwithstanding the verdict and for a new trial were denied. This appeal followed.

## II. THE FAILURE OF A JUROR TO DISCLOSE SOCIAL MEDIA RELATIONSHIP WITH THE VICTIM'S WIFE

■ Appellant first contends that he is entitled to a new trial because one of the jurors who served on his trial, "Juror 234", failed to disclose during *voir dire* that she was a Facebook "friend" of the victim's wife, Charlene Cowan. Before the *voir dire* examination began, the trial court instructed the members of the jury panel who were not among the first panel of thirty-two jurors selected for examination to remain in the courtroom, and listen to the questions being asked of the prospective jurors so that they could later respond to those same questions in the event they were added to the panel. Juror 234 was not among the first set of thirty-two potential jurors seated for the *voir dire* examination at Appellant's trial. About four hours into the jury selection process and after a lunch break, Juror 234 was called to join the panel undergoing the *voir dire* examination.

After being seated among the jury panel, Juror 234 was directly asked by the trial court if she was related to anyone involved in the case. She responded that she was not. The following discussion then occurred:

> *Trial Court:* Do you know any of these folks?
>
> *Juror 234:* I know some of the Cowan family, not close but I do know them.
>
> *Trial Court:* How would you describe your relationship to them?
>
> *Juror 234:* Casual.

The juror also disclosed that she worked with the victim's nephew, and in response to the trial court's inquiry about whether she had heard about the case, she stated, "just [through] the news." She also said that she had no opinion about the case. During questioning by the prosecutor, Juror 234 disclosed that she had worked with the victim's former wife several years before the trial. The prosecutor asked if this would cause any positive or negative feel-

ings about the victim, and the juror stated that it would not.

The following exchange occurred during defense counsel's *voir dire* examination of Juror 234:

*Defense Counsel:* You've heard all the questions I've asked. Has anything that I've asked, would you have given any different answer than anybody, the other members of the panel?

*Juror 234:* No.

*Defense Counsel:* You have no opinion about this case whatsoever; you've got a clean slate what we're talking about?

*Juror 234:* As clean as it can be, I think.

Defense Counsel: Thank you.

No one asked Juror 234 about any social media relationship she may have with any of the participants in the case. Juror 234 was not challenged for cause by either side, and she was eventually seated on the jury to try the case.

After the trial, Appellant learned that Charlene Cowan was one of Juror 234's 629 Facebook "friends." Appellant, in support of his motion for a new trial, asserted the juror's failure to disclose this social media association. The trial court denied Appellant's motion.

On appeal, Appellant argues that having Charlene Cowan, the victim's wife, as a Facebook friend "rendered [Juror 234] an impermissible member of the jury panel." Appellant contends that if Juror 234 had disclosed that association with Mrs. Co-

wan, he would have moved to strike her for cause, and if she was not stricken for cause, then he would have used a peremptory strike against her. He describes Juror 234's failure to disclose the relationship as a "failure to uphold her duty to be forthcoming and truthful" and as a "clear instance of juror misconduct."

 "As a general rule, anything which is good cause for challenge for disqualification of a prospective juror is deemed good cause for a new trial if not known or discoverable to the defendant or his counsel before the verdict and they were misled by a false answer on *voir dire.*" *Combs v. Commonwealth,* 356 S.W.2d 761, 764 (Ky.1962).[1] "Basically, the consideration is whether the rights of the accused have probably been prejudiced by concealed impartiality [sic]." *Id.* Thus, if Appellant is correct in his argument that Juror 234 improperly failed to disclose a disqualifying relationship, then his motion for a new trial based upon the post-trial discovery of that disqualification would be well-taken.

In support of his claim that the trial court erred by failing to grant a new trial, Appellant relies primarily upon the initial *voir dire* questions directed to the original thirty-two members of the venire concerning whether they knew Appellant, the victim, or their families. None of those questions specifically inquired about social media relationships. However, as shown by the *voir dire* discussion transcribed

---

1. This has long been the rule in this jurisdiction. *See Johnson v. Commonwealth,* 311 Ky. 182, 223 S.W.2d 741, 743 (1949) ("This statute [now-repealed by KRS 29A.280] makes it necessary for a party to inform himself as to the qualifications of jurors before the jury is sworn in order that he may exercise his right of challenge, general or peremptory, but the statute does not apply where he has been misled by a false answer of the juror on the latter's voir dire, and he has thus been de-

prived of his right of challenge."); *Polk v. Commonwealth,* 574 S.W.2d 335, 336–37 (Ky. App.1978) ("When bias is apparent or known before trial, and a juror is permitted to remain, the objection to the juror is waived. When such facts are not known and would not reasonably have been determined prior to the selection of the jury, no waiver is involved, and an objection may be raised upon discovery of the bias.").

above, Juror 234 was specifically asked if she knew "any of these folks." A simple "yes" or "no" would have been a properly responsive answer, but Juror 234 forthrightly disclosed that she knew "some of the Cowan family" and that her association with them was "casual."

Although succinct, her answers were responsive to the questions and truthful. We see in the record no indication that Juror 234 was attempting to conceal the social media relationship, or that she was in any way deceptive. Moreover, by her acknowledgment that she casually knew some of the Cowan family, Appellant was given an unfettered invitation to inquire further. He could have asked: "Which members of the Cowan family do you know?" Then, he could have followed up with other questions allowing him to discover the depth and scope of her acquaintances within the Cowan family. But, Appellant declined to do so.

██ While the parties have the right to assume that the answers given by potential jurors are complete, candid and truthful, we cannot expect potential jurors to appreciate the nuances of potentially disqualifying relationships, and volunteer answers to the questions that counsel failed to ask. Juror 234 manifestly did not give a false answer regarding her Facebook relationship with the victim's wife. If her casual relationship with some members of the Cowan family was cause for concern for any party, it was incumbent upon that party, not the juror, to delve more deeply into the matter. We see no misconduct on the part of Juror 234.

██ Moreover, the post-trial revelation that Charlene Cowan and Juror 234 were Facebook friends does not establish grounds for a new trial. It is now common knowledge that merely being friends on Facebook does not, *per se,* establish a close relationship from which bias or partiality on the part of a juror may reasonably be presumed. *See Sluss v. Commonwealth,* 381 S.W.3d 215, 222–23 (Ky.2012). This principle is well illustrated in this case. Here, an attachment to the supplemental motion for a new trial that Appellant filed with the trial court discloses that Juror 234 had, at the time of the trial, 629 "friends" on Facebook. She could not possibly have had a disqualifying relationship with each one of them. As we recently held in *Sluss,* " '[F]riendships' on Facebook and other similar social networking websites do not necessarily carry the same weight as true friendships or relationships in the community, which are generally the concern during voir dire." *Id.* at 222.[2] Therefore, no presumption arises about the nature of the relationship between a juror and another person with an interest in the litigation simply from their status as Facebook friends. "As with every other instance where a juror knows or is acquainted with someone closely tied to a case, it is the extent of the interaction and the scope of the relationship that is the relevant inquiry." *Id.* at 223.

██ If Juror 234's acquaintance with the victim's wife, from Facebook or otherwise, was such that it required disqualification of the juror, "[i]t [was] incumbent upon the party claiming bias or partiality to prove the point." *Polk v. Commonwealth,* 574 S.W.2d 335, 337 (Ky.App.1978).

---

**2.** In *Sluss v. Commonwealth,* we held that under the circumstances of that case the defendant was entitled to a retrospective evidentiary hearing to determine whether he was prejudiced by the juror's failure to disclose a social media relationship. 381 S.W.3d at 220–29. The instant case is easily distinguishable from *Sluss,* however, because in stark contrast to Juror 234's honest answers, the jurors in *Sluss* manifestly failed to give truthful responses regarding their social media connections to the victim's mother.

We will not simply speculate that the juror was biased. It was Appellant's responsibility to present facts, if they exist, casting doubt about the impartiality of the juror "sufficient to undermine the integrity of the verdict." *Sluss*, 381 S.W.3d at 225 (quoting *Gordon v. Commonwealth*, 916 S.W.2d 176, 179 (Ky.1995)).

In summary, Appellant has failed to meet his heavy burden for disturbing the jury verdict, and the trial court did not abuse its discretion by denying Appellant's motion for a new trial based upon Juror 234's failure to disclose her social media relationships. Appellant has failed to establish any partiality or bias whatsoever as a result of the social media relationship.

## III. CONSIDERATION OF PENALTY ISSUES DURING GUILT PHASE

█ Appellant next contends that he is entitled to a reversal because the jury impermissibly considered sentencing phase issues during its guilt phase deliberations. This allegation is based upon a note sent by the jury to the trial court during the middle of its guilt phase deliberations. The note read, "Who decides the length of the sentence—the jury or the judge?" In response, rather than specifically answering the question, the trial court advised the jury that the determination of "guilty" or "not guilty" was the only matter to be concerned with at that point; that the jury should not concern itself with a possible penalty; and that the jury should follow its instructions.

To assume from the question alone that the jury was considering the applicable penalties during the guilt phase deliberation is pure speculation. At most we can assume no more than what the question itself revealed: the jury, or some member

or members of the jury, wondered who would fix the penalty. Just before the jury retired for its guilt phase deliberations, defense counsel told them: "This is an important case. If you find [Appellant] guilty then we've got to go through the *penalty phase*. His life is in the balance here. His life is in your hands." Given defense counsel's statements, it is not surprising that the jury would wonder about the process of setting a sentence. There is nothing improper about the jury seeking clarification about what it is required to do.

█ The note was an innocuous question concerning the jury's function in the trial court proceedings and does not compel a presumption that they were factoring in improper penalty phase concerns during their guilt phase deliberations. In any event, the trial court gave a perfectly correct response to the jury's inquiry by making it abundantly clear that the jury should not be concerned with penalty phase issues, but must instead focus on the determination of guilt. We have no reason to doubt the presumption that this jury followed the judge's admonition and that Appellant suffered no prejudice in connection with its note to the trial court.[3]

## IV. EXCLUDED EVIDENCE

Appellant next contends that the trial court erred by excluding evidence which would have supported his self-defense theory. More specifically he argues that the trial court improperly excluded evidence relating to his state of mind by excluding the following evidence: (a) the victim's wife's testimony regarding the victim's history of domestic violence; (b) the victim's racist speech directed towards Appellant

---

**3.** A jury is presumed to follow an admonition given by the trial court. *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky.2003).

and his household; (c) testimony from members of Appellant's household about their fear of the victim; and (d) the testimony of Jimmy Burton concerning the victim's conduct toward him.

 We begin by noting that evidence of a victim's prior acts of violence, threats, and even hearsay evidence of such acts and threats, may be admissible if offered to prove that the defendant so feared the victim that he believed it was necessary to use physical force (or deadly physical force) in self-protection "provided that the defendant knew of such acts, threats, or statements at the time of the encounter." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.15[4][d] (4th ed.2003); *Moorman v. Commonwealth,* 325 S.W.3d 325, 332 (Ky.2010); *Murphy v. Commonwealth,* 205 Ky. 493, 266 S.W. 33, 34 (1924) (prior threats, as well as language and conduct of the victim, of which the defendant was aware, were admissible as substantive evidence on the issue of self-defense); *Commonwealth v. Girkey,* 240 Ky. 382, 42 S.W.2d 513, 514 (1931) (threats and hostile acts on the part of the deceased against a defendant claiming self-defense are admissible); *Campbell v. Commonwealth,* 88 Ky. 402, 11 S.W. 290, 292 (1889) ("The threats of the deceased to take the life of the accused, accompanied by an effort to do so, . . . would, of course, be competent on the issue of the defense of the [accused].") With the above principles in mind, we turn to the four instances of alleged error.

**A. The Victim's Acts of Domestic Violence Against His Wife**

 Appellant contends that the trial court erred by disallowing testimony from Charlene Cowan concerning two episodes of domestic violence which occurred in 1995 and 1996, some fifteen years prior to the crime being tried. Appellant argues that the evidence was admissible to show Cowan's propensity to violence and because in response to questioning about whether the victim "had a reputation for being a violent man," Charlene Cowan responded "[w]ell, he didn't take anything from people. I don't know that he was violent." During her avowal testimony Charlene indicated that during their relationship they had exchanged threats to kill each other; that they had been "very mad at each other"; and that the domestic violence orders [DVOs] were a result of "one of our many heated arguments years ago." [4]

 "Because prior acts of violence or threats of violence against persons other than the victim in the case on trial have significantly less probative value than similar prior acts and threats against the same victim, as a general rule 'specific threats directed against third parties are inadmissible.'" *Driver v. Commonwealth,* 361 S.W.3d 877, 885–86 (Ky.2012) (quoting *Sherroan v. Commonwealth,* 142 S.W.3d 7, 18 (Ky.2004)). "[A] threat to kill or injure someone which is specifically directed at some individual other than the deceased is inadmissible, as it shows only a special malice resulting from a transaction with which the deceased had no connection." *Id.* at 886 (quoting *Jones v. Commonwealth,* 560 S.W.2d 810, 812 (Ky.1977)). "An exception has been recognized when the threat against the third person is so close in time to the charged offense as to be considered a part of the same transaction." *Id.; see Chatt v. Commonwealth,* 268 Ky. 141, 103 S.W.2d 952, 954–55 (1937) (threat against third party less than a

4. While reviewing her affidavits from the DVO cases Charlene stated, "You just had to understand our relationship. If he wasn't threatening to kill me, I was going to kill him. We got so mad at each other.... You never used a term that you didn't mean?"

minute before the killing); *see also Smith v. Commonwealth*, 92 S.W. 610, 610–11 (Ky.1906) (threat against third party five minutes before the killing).

In *Driver v. Commonwealth*, 361 S.W.3d at 885–86, we discussed the rule of remoteness and held in that case that evidence of the defendant's violence against his ex-wife, a third party in the trial, twelve years prior to the crimes being tried was inadmissible because it was too remote in time. By that same rationale, we conclude that the trial court in this case properly excluded the remote domestic violence evidence. Furthermore, Appellant offered no evidence that he was aware of the victim's domestic violence toward his wife, and thus her testimony would not have been relevant to establishing Appellant's fear of the victim.

■ Appellant argues, in the alternative, that the evidence was admissible to impeach Mrs. Cowan's testimony disputing the victim's character for violence. Generally, a homicide defendant may introduce evidence of the victim's character for violence in support of a claim that he acted in self-defense or that the victim was the initial aggressor. KRE 404(a)(2); *Johnson v. Commonwealth*, 477 S.W.2d 159, 161 (Ky.1972); Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 2.15[4][b], at 104. However, such evidence may only be in the form of reputa-tion or opinion, not specific acts of misconduct. KRE 405(a);[5] Lawson, *The Kentucky Evidence Law Handbook* § 2.20[4], at 116 ("By providing only for the use of reputation or opinion evidence in this situation, the rule plainly implies a prohibition on evidence of particular acts of conduct."). In *Johnson*, our predecessor court held that a homicide defendant could not introduce the victim's police record for the purpose of showing his propensity for violence. 477 S.W.2d at 161. Similarly, the trial court in this case properly excluded the particular acts of conduct regarding the events surrounding the 1995 and 1996 DVOs. Moreover, Appellant may not avoid the foregoing rule by characterizing his effort to elicit the same evidence as "impeachment." *Slaven v. Commonwealth*, 962 S.W.2d 845, 858 (Ky.1997) (A party cannot knowingly elicit testimony as a guise or subterfuge to impeach a witness with otherwise inadmissible evidence.).

### B. The Victim's Racist Speech

■ As previously noted, the evening before Cowan's death, Trooper Wolking responded to Appellant's 911 complaints about harassment by Cowan, involving the spotlights focused upon Appellant's property. Appellant proffered Wolking's testimony, as avowal evidence, that Cowan referred to Appellant's fiancè and her child as the "nigger baby and its nigger moth-

---

5. KRE 405 provides that "(a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation in the community or by testimony in the form of opinion, (b) Inquiry on cross-examination. On cross-examination of a character witness, it is proper to inquire if the witness has heard of or knows about relevant specific instances of conduct. However, no specific instance of conduct may be the subject of inquiry under this provision unless the cross-examiner has a factual basis for the subject matter of the inquiry, (c) Spe-cific instances of conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." The evidence was not admissible under KRE 405(b) because the Commonwealth had not called Charlene in support of the victim's good character so as to open the door to specific instances of prior conduct, and it was not admissible under KRS 405(c) because no character trait of the victim was an essential element of any charge, claim, or defense in this case.

er." Wolking also said in his avowal testimony that Cowan had stated repeatedly that the "nigger baby and nigger mother needed to live down the road with the other niggers and Mexicans."

Appellant contends that this evidence was relevant to show Cowan's propensity for violence. While the statements made by Cowan were outrageously racist, it does not follow that this character flaw translates into a propensity for violent conduct. Thus, this particular evidence was of little probative value. On the other hand, its admission into evidence at trial would have substantially diminished the character of the victim in a way that would have been highly prejudicial to the Commonwealth's case. Cowan's racist comments to the police officer would unduly influence the jury simply because of the victim's verbal expressions of a racist attitude. It follows that the trial court did not abuse its discretion by excluding the evidence.

**C. Appellant's Family's Fear of Victim**

 Appellant contends that the trial court improperly excluded the testimony of his fiance and her child regarding their personal fear of Cowan because he had harassed and terrorized them. However, both witnesses testified, to a degree, regarding their fear of Cowan, and Appellant fails to cite us to any avowal testimony, or other means of making known the substance of the. testimony [6] that was excluded by the trial court. Thus, because of Appellant's failure to develop this argument sufficiently for us to undertake a meaningful review of the issue, he is not entitled to relief upon the grounds that the trial court excluded testimony of his household regarding their fear of Cowan. *Bay-*

less v. Boyer, 180 S.W.3d 439, 447 (Ky. 2005) ("[W]ithout an avowal to show what a witness would have said an appellate court has no basis for determining whether an error in excluding his proffered testimony was prejudicial"). *See also* CR 76.12(4)(c)(v); *Harris v. Commonwealth,* 384 S.W.3d 117, 130–31 (Ky.2012) (defendant did not comply with the civil rule requirements relating to the "arguments" section in his appellant's brief, and thus those claims would not be addressed).

**D. The Victim's Threatening Gesture to Jimmy Burton**

Finally, Appellant contends that the trial court erred by excluding Jimmy Burton's testimony that twenty-five years before he was killed, Cowan had pointed a gun at Burton. Exclusion of this evidence was proper for two reasons. First, there is no indication that Appellant was aware of this event in the moments leading up to Cowan's death. Second, Cowan's implied threat against Burton, as manifested by the act of pointing the gun at him, was far too remote in time to have any relevance in this action. *See Driver,* 361 S.W.3d at 885–86.

In summary, we conclude that the trial court's exclusion of the evidence described above affords Appellant no grounds upon which his conviction should be reversed.

**V. CONCLUSION**

For the foregoing reasons, the Judgment of the Adair Circuit Court is affirmed.

All sitting. All concur.

---

6. KRE 103(a) provides, "Error may not be predicated upon a ruling. which admits or excludes evidence unless a substantial right of the party is affected; and . . . (2) . . . If the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."