## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 30 2020, 9:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah Swinney
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dylan M. Morgan, *Appellant-Defendant*, | December 30, 2020 |
| v. | Court of Appeals Case No. 20A-CR-634 |
| | Appeal from the Vigo Superior Court |
| State of Indiana, *Appellee-Plaintiff*. | The Honorable John T. Roach, Judge |
| | Trial Court Cause No. 84D01-1808-MR-2779 |

**Brown, Judge.**

[1] Dylan M. Morgan appeals his convictions and sentence for murder, altering the scene of a death, and obstruction of justice as level 6 felonies, possession of marijuana as a class B misdemeanor, and possession or consumption of alcohol as a class C misdemeanor. He raises three issues which we restate as:

I. Whether the trial court abused its discretion in denying his motion related to alleged juror misconduct;

II. Whether the evidence is sufficient to sustain his conviction for murder; and

III. Whether his sentence is inappropriate in light of the nature of the offenses and his character.

We affirm.

## Facts and Procedural History

[2] On the evening of August 4, 2018, Gage Eup, who was eighteen years old, attended a party, and around midnight, Eup's friend, Bryce Weir, arrived. At that time, Morgan, Sabrei Neace, Gary Flowers, and others were also present. Morgan and others were drinking alcohol and smoking marijuana. At some point, Morgan, Eup, and Weir were the only individuals remaining at the house, and they took turns playing music. Morgan did not like the music Eup played and stated: "Change that song or I'll go get my gun." Transcript Volume III at 51. Weir and Eup, who were under the influence, thought it was hilarious, and told him to do it. Morgan said "Alright," walked to his back

room, returned with a gun, and said, "Change that f----- song now." *Id.* at 51-
52. Eup changed the song and was still laughing.[1]

[3]   Morgan removed the magazine from the gun and a bullet ejected. Morgan and
Eup looked for the bullet, and Weir then "kind of zoned out." *Id.* at 90. At
some point, Morgan said, "Hey, look at this," or "Hey, watch this." *Id.* at 54.
Morgan was standing and pointing the gun at Eup with his arm fully extended
while Eup was looking at the television. Morgan pulled the trigger, and Weir
observed Eup "standing there bleeding from two different directions." *Id.* at 56.
Eup "kind of wabbled" and fell backwards. *Id.*

[4]   Weir "went into shock," gathered his stuff, and told Morgan that he needed to
leave. *Id.* at 57. Morgan told him that "we can't speak of it, and that we gotta
say it was suicide." *Id.* Weir told him, "Alright man. We can say that," and
"All I gotta do is go." *Id.* Before leaving, Weir did not see Morgan make any
effort to help Eup. As Weir was leaving, Morgan said: "You aren't gonna say
nothin are you?" *Id.* at 58. Weir said "No," ran to a safe distance, and called
the police. *Id.*

[5]   Morgan called Neace and told her: "[Eup] shot himself, I don't know what to
do." *Id.* at 109. Neace and Flowers returned, and Neace picked up the firearm,

---

[1] Weir testified: "[Eup] is still laughing. But at the same time, I mean, you got a gun pointing at you. You're
not laugh laughing, you're just kind of just like, you know, bring the tension down I would assume."
Transcript Volume III at 52. On cross-examination, Weir testified that Eup was "not laughing as much now
that the gun was out." *Id.* at 72.

which was on Eup's left side near his torso, and threw it on the couch. Morgan placed the table that had been used for beer pong into the kitchen, Neace asked him why he was moving the table, and Morgan "didn't really say anything," "just kind of shrugged it off and just kept cleaning." *Id.* at 114. Morgan then picked up the firearm, took it into the kitchen, started cleaning it under water from the faucet, and said that "they couldn't know that it was his gun because then they would think that he hurt" Eup. *Id.* Neace said she was going to call the police, and Morgan kept saying "not yet." *Id.* at 117. Neace found her phone and called 911. Morgan said to tell the police that Eup brought the gun in his backpack, was waving it around and playing with it, and shot himself. Eup died as a result of the gunshot wound.

[6] Meanwhile, Terre Haute Police Patrolman Tell Howson was dispatched to Weir's location, and Weir, who was short of breath, identified himself. Weir told him the address where the incident had occurred, which was about .6 to .8 miles away, and Patrolman Howson radioed the location to other officers. Other officers arrived at the residence and transported Morgan to the police station.

[7] On August 5, 2018, Terre Haute Police Detectives Kenneth Murphy and David Thompson interviewed Morgan. Morgan stated that Eup pulled a handgun out of his backpack, everyone told him to put it away, he flashed it around, cocked the gun, waved it around, and shot himself. He stated he did not shoot a gun that night and was alone with Eup when Eup shot himself. Upon questioning by Detective Murphy, Morgan stated that he took a young kid's life, was just

messing around, and was "just trying to f--- with him." State's Exhibit 18 at 11:57-12:00. He stated that he pulled the trigger because he did not think there was a bullet in the chamber and that they did not have an argument prior to the shooting. Upon questioning, he stated that he told Eup to "change the f------ music." *Id.* at 14:10-14:12. Upon further questioning, Morgan admitted someone else was in the house when the shooting occurred, that he told the other person he needed to stay there and they needed to call the police, but the other person left.

[8] At one point, Morgan stated that he should not have lied and he should have just told them that there was someone else present. Detective Thompson stated:

> Yeah, you should have. Because it makes everything from here on out hard to believe. Do you know what I think happened? I think you told him when he was playing that song to turn the s*** off. And I think you told him to turn the s*** off or you were going to kill him.

*Id.* at 36:50-37:07. Morgan stated that he did not say that but he could understand why he would think that.

[9] On August 8, 2018, the State charged Morgan with: Count I, murder; Count II, reckless homicide as a level 5 felony; Count III, altering the scene of death as a level 6 felony; Count IV, obstruction of justice as a level 6 felony; Count V, possession of marijuana as a class B misdemeanor; and Count VI, illegal consumption of an alcoholic beverage as a class C misdemeanor.

[10]     During *voir dire*, the court asked if any of the potential jurors knew Morgan or his counsel, and J.B., a potential juror indicated she knew Attorney Paul Jungers and was casual friends with him and his wife. J.B. also indicated that Attorney Jungers' wife was a pharmaceutical sales rep and called on her at her job. Upon questioning by the court, J.B. indicated she could be fair to the State, keep an open mind, and not be biased in favor of Attorney Jungers.

[11]     The prosecutor read a list of witnesses the State intended to call and did not mention Detective Thompson. The court asked if anyone knew the witnesses and questioned them if they answered affirmatively. Later during *voir dire*, J.B. indicated she could follow the instruction to not allow any bias or sympathy to play a role in arriving at a verdict and that, if the State failed to prove one element beyond a reasonable doubt, she would find Morgan innocent.

[12]     During his opening statement, defense counsel asked the jury to return a verdict of not guilty on the murder charge and asked the jury to convict Morgan of reckless homicide. The State presented the testimony of Weir, Neace, Flowers, and Detective Murphy. The court admitted the recorded interview of Morgan without objection.

[13]     Mitzie Templeton, a forensic firearm tool mark examiner with the Indiana State Police Laboratory, testified that the firearm had a manual safety and a magazine safety, which both operated as designed, and that nothing prevented the firearm from functioning properly. She also indicated that no functional defects were found, it test fired normally, and everything operated as designed.

On cross-examination, Templeton indicated that she had seen the report prepared by John Nixon. She testified that the magazine was missing parts and broken but "functionally it works." Transcript Volume III at 220. When asked if the tape on the magazine appeared to impede the ability to drop the magazine out or release it, she answered: "No, it was, it was pretty far down, so I didn't see where it affected anything." *Id.* at 222.

[14] After the State rested, the defense presented the testimony of Nixon, who had a degree in mechanical engineering and was an NRA certified firearms instructor. He testified that he examined the High Point 9mm pistol and that the floor plate of the magazine came off after several loadings, and he obtained an additional magazine to continue his testing. He testified that the gun had a design flaw "[b]ecause the magazine is a long way out at the point that the safety is activated or deactivated." Transcript Volume IV at 33. He disagreed with Templeton's statement that the only way the gun is completely safe is when the magazine is completely removed. When asked why he disagreed, he stated that the magazine disconnect safety was a mechanical device and a shooter should never trust any mechanical safety. He indicated that the trigger could pull with the magazine removed if there was debris. He also testified that he had seen people "pull the slide back and a round is ejected from the chamber," "then they release the slide and they think the gun is unloaded," "[t]hey take the magazine out next, not realizing that they've loaded a fresh round into the chamber, so there's still one in there." *Id.* at 37.

[15]     On cross-examination, he indicated that he found no defects in the gun that would impact the ability of it to fire. He also testified that the magazine disconnect was working properly when he tested it and he did not fire the gun at all during his testing. He testified that "[i]f the magazine is removed first, and then the slide is cycled, and if you're sure that the round comes out of the chamber, then the gun is completely empty." *Id.* at 53. Upon questioning by the court regarding questions from the jury, he testified that "if you've got the thumb safety in the 'on' position, no matter what the position is on the magazine safety, the gun will not fire." *Id.* at 56.

[16]     During deliberations, the jury asked to review a portion of Morgan's video statement, and the recorded interview was played. The jury returned to deliberations and asked "if Count 1 is guilty, is Count 2 guilty as well? Should be [sic] pick one or the other?" *Id.* at 96. The court informed the jury that if the State "proves the defendant guilty of murder you cannot find the defendant guilty of reckless homicide." *Id.* at 97.

[17]     After the jury reached a verdict, the court asked if there was a foreperson, and J.B. identified herself. The jury found Morgan not guilty of Count II, reckless homicide, and guilty of the remaining charges. The court discharged the jury.

[18]     On January 24, 2020, Morgan filed a Motion to Correct Error alleging juror misconduct and insufficient evidence of murder. Morgan's counsel alleged that he learned J.B. personally knew Detective Thompson and failed to disclose the relationship, the parties were unable to question her about the relationship and

potential bias, and Morgan was likely harmed. He also asserted that it was likely that J.B. intentionally concealed this information because she notified the court about knowing a different witness during the trial but did not notify the court about knowing Detective Thompson. He stated that J.B. and her husband were friends with Detective Thompson on Facebook and commented on his posts. He learned through online research that J.B. was a nurse practitioner at a medical practice where Detective Thompson's wife worked as a doctor and that they had worked together at the same practice for several years. He argued that J.B. "could have been influence[d]/biased in her impartially [sic] simply by the fact that she would have to face her co-worker after acquitting the Defendant (had she done so) on her co-worker Dr. Thompson's husbands' case, which certainly could create an awkward work environment." Appellant's Appendix Volume II at 183. He requested a new trial or that the juror be summoned for a hearing or *in camera* interview.

[19] On January 27, 2020, the State filed a response. On February 13, 2020, the court denied Morgan's motion. With respect to the claim of juror misconduct, the court concluded that "[t]he allegations of an *appearance* of a relationship that *could* be construed or interpreted to have compromised her partiality is not 'specific, substantial evidence' that justifies a new trial or a hearing to explore potential bias and prejudice." *Id.* at 200.

[20] On February 24, 2020, the court held a sentencing hearing. Eup's mother, younger brother, and father read statements to the court. Jordan Cleeton, Morgan's older brother, testified that Morgan's mother was killed in a

motorcycle accident in 2017 and Morgan received mental health treatment and attempted suicide multiple times. On cross-examination, Cleeton testified that Morgan was nineteen years old when his mother was killed, he was not aware Morgan used cocaine, and he agreed that Morgan's marijuana use was not the result of losing his mother.

[21] Cynthia Hurt, an adult education teacher, testified that she taught at the jail and Morgan came to her as a student in September 2018. She testified Morgan was very bright, an exemplary student, and had qualified to take the high school equivalency exam.

[22] Morgan stated he was sorry to the Eup family and that he did not intend to bring Eup any harm, was very reckless, childish, and stupid, and was going to obtain his GED, further his education, and use whatever program was available to him.

[23] The prosecutor argued for a sentence of fifty-five years on the murder conviction. Morgan's counsel asked for the minimum sentence of forty-five years with any time in excess of that suspended.

[24] The court stated:

> I will tell you this, what stands out to me, from having observed that statement that was played in front of the jury. It really gets down to what the State was saying and that was, uh your attempt, your repeated attempts, when you would hit a blockade, when one false statement, false statement didn't seem like it was panning out. How quickly you jumped into the next false statement. Uh, and when that didn't pan out, how quickly you

were able to, to jump into the next false narrative. Uh and that was something that maybe you were in a panic at the scene maybe, I don't know. Uh, but quite frankly when [the prosecutor] said you were able to turn the tears on and off, I didn't see any tears. I heard a lot of what impressed me to be, uh effort on your part to appear upset. But, that's not, that's not what I concluded what was going on, when I watched it. There was a lot of manipulation going on and to me manipulation in the midst of a panic, trying to figure out what you are going to do, is a lot different if there was true remorse and true sorrow and true shock about what happened as opposed to just trying to get the best life possible and to that extend, [sic] I agree with the State's argument on that. Uh, I can't consider, uh that what an impacted a lesson, uh an advisory sentence would have in terms of a dimensioning [sic] the serious of the crime. I can't consider that in aggravation. I can consider in response to a request for a mitigated sentence. Uh and I am, I am considering it in that light. On balance I attend [sic] to agree with the State. Uh, I attend [sic] to agree with the State that the advisory sentence is appropriate in this case.

*Id.* at 148-149.

[25]    In its order, the court found that "statutory aggravating factors under I.C. § 35-38-1-7.1(a)(2) and (a)(6) exist, but [did] not find the aggravating factor under (a)(4) is supported."[2] Appellant's Appendix Volume II at 203. The court found

_____

[2] Ind. Code § 35-38-1-7.1(a) provides that "[i]n determining what sentence to impose for a crime, the court may consider the following aggravating circumstances: . . . (2) The person has a history of criminal or delinquent behavior . . . (4) The person: (A) committed a crime of violence (IC 35-50-1-2); and (B) knowingly committed the offense in the presence or within hearing of an individual who: (i) was less than eighteen (18) years of age at the time the person committed the offense; and (ii) is not the victim of the offense . . . (6) The person has recently violated the conditions of any probation, parole, pardon, community corrections placement, or pretrial release granted to the person."

that the evidence did not support Morgan's "proffer in mitigation under I.C. § 35-38-1-7.1(b)(2), (4) and (7)" and that "[t]he nature and circumstances surrounding the crimes at issue also undercut these factors."[3]  *Id.*  The court did not find mitigation in Morgan's age, but assigned "some mitigating weight to [Morgan's] expression of remorse, that he has taken steps to obtain his GED, and to his history of mental health issues."  *Id.*  The court stated that, "[o]n balance, the court believes the advisory sentence in this case is appropriate" and "[t]o mitigate the sentence below the advisory would diminish the seriousness of defendant's crime."  *Id.*  The court sentenced Morgan to concurrent sentences of: fifty-five years for Count I, murder; one year on Count III, altering the scene of a death, and Count IV, obstruction of justice; 180 days on Count V, possession of marijuana; and sixty days on Count VI, illegal possession of alcohol.  The court's order also stated that, "[w]hen [Morgan] has completed forty-five (45) years of the executed sentence, he may request the court to consider modification."  *Id.* at 204.

## *Discussion*

### I.

---

[3] Ind. Code § 35-38-1-7.1(b) provides that the court "may consider the following factors as mitigating circumstances or as favoring suspending the sentence and imposing probation . . . (2) The crime was the result of circumstances unlikely to recur . . . (4) There are substantial grounds tending to excuse or justify the crime, though failing to establish a defense . . . (7) The person is likely to respond affirmatively to probation or short term imprisonment."

[26] The first issue is whether the trial court abused its discretion in denying Morgan's motion related to alleged juror misconduct. Generally, proof that a juror was biased against the defendant or lied on *voir dire* entitles the defendant to a new trial. *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind. 1988) (citing *McDaniel v. State*, 268 Ind. 380, 375 N.E.2d 228, 232 (1978); *Berkman v. State*, 459 N.E.2d 44, 45 (Ind. Ct. App. 1984), *trans. denied*). A defendant seeking a hearing on juror misconduct must first present some specific, substantial evidence showing a juror was possibly biased. *Id.* (citing *Berkman*, 459 N.E.2d at 46). The specific, substantial evidence requirement "was developed as a bulwark against post-trial juror harassment." *Easler v. State*, 131 N.E.3d 584, 589 (Ind. 2019). "If jurors who returned a guilty verdict and were discharged could be hauled back to a hearing about their alleged bias or misconduct based on mere blanket or conclusory allegations, there would be a very real risk of juror harassment." *Id.* In order to warrant a new trial, there must be a showing that the misconduct was gross, and that it probably harmed the defendant. *Lopez*, 527 N.E.2d at 1130 (citing *Reed v. State*, 479 N.E.2d 1248, 1251 (Ind. 1985); *Gann v. State*, 263 Ind. 297, 300, 330 N.E.2d 88, 91 (1975)). The issue of juror misconduct is a matter within the trial court's discretion. *Id.* (citing *Bixler v. State*, 471 N.E.2d 1093, 1098 (Ind. 1984), *cert. denied*, 474 U.S. 834, 106 S. Ct. 106 (1985)).

[27] Morgan does not allege that J.B. lied during *voir dire*. While Detective Thompson was one of the detectives interviewing Morgan in the recorded interview, he did not testify as a witness. To the extent Morgan asserts J.B. was

Facebook friends with Detective Thompson, we note that "merely being friends on Facebook does not, *per se*, establish a close relationship from which bias or partiality on the part of a juror may reasonably be presumed." *See Slaybaugh v. State*, 44 N.E.3d 111, 118 (Ind. Ct. App. 2015) (quoting *McGaha v. Commonwealth*, 414 S.W.3d 1, 6 (Ky. 2013)), *aff'd*, 47 N.E.3d 607 (Ind. 2016). Morgan did not specify the content of the comments by J.B. or her husband on Detective Thompson's Facebook page, the time such comments occurred, or that the comments revealed any knowledge of the case. We also note that during *voir dire*, the prosecutor asked J.B. if she could follow the instruction not to allow any bias or sympathy play a role in arriving at a verdict, and she answered affirmatively. Defense counsel also asked J.B.: "If you felt that [the State] didn't prove one element beyond a reasonable doubt, what, what is a juror supposed to do if they're following their oath?" Transcript Volume II at 84. She answered: "I would say innocent then." *Id.* at 85. Under the circumstances, we cannot say that Morgan presented specific, substantial evidence showing J.B. was possibly biased, that he was probably harmed, or that the court abused its discretion.

## II.

[28] The next issue is whether the evidence is sufficient to sustain Morgan's conviction for murder. Morgan argues that the evidence was insufficient to prove that he was aware of a high probability that he would kill Eup when he

pointed the gun at him. He argues that he must have only partially inserted the magazine into the handgun and assumed that the handgun would not fire because the magazine was not fully inserted and "yet the magazine was still far enough in that it disengaged the safety mechanism, allowing the handgun to fire." Appellant's Brief at 22. He asserts that the magazine was not fully inserted when the police found the gun and it had a round in the chamber indicating that the magazine was inserted far enough that the gun had chambered a new round after it was fired.

[29] When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[30] Ind. Code § 35-42-1-1 governs the crime of murder and provides that a person who knowingly or intentionally kills another human being commits murder, a felony. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2. "A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." *Id.* The Indiana Supreme Court has "unequivocally determined that the requisite intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm ." *Maxwell v. State*, 731 N.E.2d 459, 462 (Ind. Ct. App. 2000)

(citing *Bartlett v. State*, 711 N.E.2d 497, 500 (Ind. 1999); *Wilson v. State*, 697 N.E.2d 466, 475 (Ind. 1998), *reh'g denied*; *Barany v. State*, 658 N.E.2d 60, 65 (Ind. 1995); *Shelton v. State*, 602 N.E.2d 1017, 1022 (Ind. 1992); *Johnson v. State*, 455 N.E.2d 932, 936 (Ind. 1983)), *trans. denied*.

[31]  The evidence shows that Morgan was familiar with the gun. Weir testified that Morgan showed him the gun roughly two weeks prior to the shooting "kind of like you would something that you hold very proudly to yourself, you would want to show it off." Transcript Volume III at 61. Neace testified that she had seen Morgan fire the High Point on New Year's 2018, he "got [the firearm] out quite often," and that "anytime anyone new came over he would show them that he had a gun." *Id.* at 100. Flowers testified that Morgan brought out the gun when they hung out and "just messed with it and cleaned it and stuff." *Id.* at 139. He also stated that he knew Morgan "made sure the safety was on most of the time." *Id.* Templeton, the forensic firearm tool mark examiner, testified that nothing prevented the firearm from functioning properly.

[32]  After Eup started playing music that Morgan did not like, Morgan stated: "Change that song or I'll go get my gun." *Id.* at 51. Morgan returned with a gun and said: "Change that f----- song now." *Id.* at 51-52. At some point later, Morgan pointed the gun at Eup and pulled the trigger. We conclude that the State presented evidence of probative value from which a reasonable jury could have determined beyond a reasonable doubt that Morgan was guilty of murder.

III.

[33] The next issue is whether Morgan's sentence is inappropriate in light of the nature of the offenses and his character. Morgan argues his culpability did not rise to the level of intentional murder, his criminal history included a single misdemeanor, and he was remorseful, struggled with anxiety and depression, and was only twenty years old at the time of the offense.

[34] Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[35] Ind. Code § 35-50-2-3 provides that a person who commits murder shall be imprisoned for a fixed term of between forty-five and sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-7 provides that a person who commits a level 6 felony shall be imprisoned for a fixed term of between six months and two and one-half, with the advisory sentence being one year. Ind. Code § 35-50-3-3 provides that a person who commits a class B misdemeanor shall be imprisoned for a fixed term of not more than 180 days. Ind. Code § 35-50-3-4 provides that a person who commits a Class C misdemeanor shall be imprisoned for a fixed term of not more than sixty days.

[36] Our review of the nature of the offenses reveals that Morgan smoked marijuana, retrieved his gun after Eup played music he did not like, told him to

"[c]hange that f----- song now," and ultimately pointed the gun at him and pulled the trigger. Transcript Volume III at 52. He told Weir that they had to say it was suicide. He began cleaning and cleaned the firearm under the faucet instead of calling 911. He told Neace that Eup shot himself, to tell the police that story, and not to call 911 yet.

[37] Our review of the character of the offender reveals that Morgan, who was born in 1998, was charged with possession of marijuana as a class B misdemeanor and possession of paraphernalia as a class C misdemeanor in 2016. On August 24, 2017, he "was placed on pre-trial diversion and placed on 6 months informal probation, 40 hours of community service and complete marijuana class." Appellant's Appendix Volume II at 210. The presentence investigation report ("PSI") indicates that he failed to complete the class and community service, was sentenced on March 22, 2018, to 180 days and placed on probation, and the charge of possession of paraphernalia was dismissed. The PSI states that Morgan had "a 'great' childhood growing up with his father in a home that was free from abuse, neglect and molestation." *Id.* at 211. Morgan had a past relationship with Neace which produced one child. He last attended Terre Haute North Vigo High School, but did not graduate and was not employed prior to his arrest. He reported having been diagnosed with depression and anxiety and attempted suicide after his mother died in 2017.

[38] Morgan reported first experimenting with alcohol and drugs at the age of thirteen, admitted to using marijuana, pills, and cocaine, and that his drug of

choice was marijuana. He denied ever participating in substance abuse programs but believed he would benefit from treatment.

[39] After due consideration, we conclude that Morgan has not sustained his burden of establishing that his advisory sentence for murder served concurrently with his other sentences is inappropriate in light of the nature of the offenses and his character.

[40] For the foregoing reasons, we affirm Morgan's convictions and sentence.

[41] Affirmed.

Vaidik, J., and Pyle, J., concur.