RENDERED: FEBRUARY 18, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0262-MR

DAVID WAYNE DOOLEY                                            APPELLANT

ON APPEAL FROM BOONE CIRCUIT COURT
HONORABLE JAMES R. SCHRAND, II, JUDGE
V.                          NO.  12-CR-00622

COMMONWEALTH OF KENTUCKY                              APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

A circuit court jury convicted David W. Dooley ("Dooley'), of the murder of Michelle Mockbee and tampering with physical evidence.  Dooley was sentenced to forty-three years' imprisonment, consistent with the jury's recommendation.

Dooley appeals the resulting judgment as a matter of right,[1] raising several claims of error, most evidentiary in nature:  1) that the trial court erred in allowing evidence of time fraud by Dooley and his wife as unfairly prejudicial evidence of criminal propensity; 2) that the trial court improperly admitted various pieces of tangible evidence; 3) that the trial court improperly allowed adverse witness testimony in violation of KRE[2] 615; and 4) that the trial court improperly refused to give a missing-evidence jury instruction.  Finally, if none

---

[1] Ky. Const. § 110(2)(b).

[2] Kentucky Rules of Evidence.

of these claims supports reversible error alone, Dooley argues their cumulative effect requires reversal.

We find the trial court erred in admitting two items of tangible evidence but that this was not enough to warrant reversal, even cumulatively. Accordingly, we affirm the judgment.

## I. FACTUAL BACKGROUND

Michelle Mockbee's dead body was found cut and beaten, hands and feet bound, with a plastic restaurant take-out bag over her head. The body was discovered in the mezzanine area of the commercial building where Mockabee worked, Thermo Fisher Scientific ("TFS"), a large medical supply facility. She worked as an administrative assistant who handled TFS's payroll and timesheets. On the morning she was killed, Mockbee arrived to work early, before operations had begun, as she customarily would when timesheets were due.

Janet Dooley cleaned TFS's offices under contract for a fixed monthly salary, plus an hourly wage when she cleaned the warehouse. Her hourly pay was tracked by clocking in and out by timecard. Janet's husband, David Wayne Dooley, helped her at TFS. Dooley also clocked in to help clean the warehouse. The Dooleys were both scheduled to work the morning of Michelle's murder, but for a few weeks before and the morning of the murder, Dooley came in by himself while Janet stayed home sick. Apparently, Dooley had been clocking in for himself and his wife, too, for this period.

2

TFS shares a sprawling four-acre site with an industrial concern, Beckman Coulter, Inc. In and around TFS, several people, including regular employees in various roles and delivery-truck drivers, were onsite when the murder happened. But no one witnessed Michelle's murder or evidence of her murder being tampered with by a perpetrator, nor did anyone admit to seeing or participating in it. The murder scene was bloody, necessitating investigators to use a blood-search chemical. The investigation showed bi-directionality of blood smearing, indicative of wiping.

Dooley became the primary focus of the investigation after part of the restaurant bag covering Michelle's head tested positive for Dooley's male DNA. The janitor's closet Dooley used tested positive for industrial bleach soon after the murder; employees noticed Dooley on the jobsite that morning wearing noticeably, pristinely clean white shoes not seen on him at the jobsite before; and Dooley apparently left for home around the time of the murder, allegedly to check on his wife. Ultimately, the Commonwealth's case against Dooley consisted entirely of circumstantial evidence, which affects our analysis of his trial.

## II. STANDARD OF REVIEW

Dooley has preserved all the issues he now appeals. Preserved claims of error are reviewed subject to our normal standards.[3] This analysis first requires us to identify if there was an error at trial, and if an error is identified we

---

[3] *Ordway v. Commonwealth*, 391 S.W.3d 762, 774 (Ky. 2013).

determine whether that error was harmless or if it affected the substantial rights of the parties.[4]  If we determine an error was harmless, we will affirm.  An error will be deemed harmless if we can say with fair assurance that it did not substantially sway the verdict against the defendant.[5]  If such an identified error has constitutional implications, we will affirm only if the error was harmless beyond a reasonable doubt.[6]

### III.  ANALYSIS

**A. The trial court's admission of evidence of Dooley's time fraud as motivation to murder.**

Error in admitting evidence in violation of KRE 403 and 404 we review for abuse of discretion.[7]  A trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by legal principles.[8]

At trial, the Commonwealth sought and was allowed to admit witness testimony and a PowerPoint presentation depicting the extent of Dooley's time fraud.[9]  Dooley had been clocking in for his wife even though she was at home.

---

[4] *See id.* (citing Rules of Criminal Procedure (RCr) 9.24; *Kotteakos v. United States*, 328 U.S. 750 (1946)).

[5] *Ordway*, at 774.

[6] *Nunn v. Commonwealth*, 461 S.W.3d 741, 750 (Ky. 2015) (citing *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 n.1 (Ky. 2009)).  *See Crossland v. Commonwealth*, 291 S.W.3d 223, 231 (Ky. 2009) ("Errors of constitutional import—the most fundamental and serious type of errors—are generally analyzed under a harmless error standard.").

[7] *Hall v. Commonwealth*, 468 S.W.3d 814, 827 (Ky. 2015), and *Gray v. Commonwealth*, 534 S.W.3d 211, 213 (Ky. 2017), respectively.

[8] *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007).

[9] "Time fraud," generally speaking, is the act of clocking in for an hourly wage when one is not working or is not otherwise entitled to be drawing a wage on the clock.

4

The Commonwealth asserts that this evidence was properly admitted under KRE 404(b), showing Dooley's motive to murder Mockbee and that it was not being offered to show a general criminal propensity.

The main thrust of Dooley's counterargument is that the Commonwealth's motive theory relies on a chain of inferences too extensive, presumptive, and attenuated for the fraud to be relevant. The trial court assumed, he avers, far too many unproven facts to admit evidence of his time fraud, even for the purposes of proving motive under KRE 404(b). Specifically, he argues the proffered motive could only have existed if Mockbee was aware of the fraud by the time of her death, if Dooley specifically expected discipline or reprimand, and if the consequences would have been enough to motivate Dooley to murder. Since these circumstances were not themselves proven, his argument goes, his time fraud is not relevant as a preliminary matter under KRE 104, and therefore cannot be admitted as relevant to motive under KRE 404(b).

Evidence is admissible only if it is relevant.[10] Evidence is relevant if it is material and probative.[11] It is material if it goes to a fact of consequence in the case, and it is probative if it tends to make a matter of fact even marginally more or less likely.[12] But a trial court should not admit even relevant evidence if the danger of unfair prejudice substantially outweighs its probative value.[13]

---

[10] *See* KRE 402.

[11] KRE 401.

[12] *Id.*

[13] KRE 403.

Under KRE 104, where the relevance of evidence depends on the truth of other preliminary facts, the trial court may allow such proof of relevance. The trial court may then, within its broad discretion, admit evidence if enough underlying proof of relevance exists for a reasonable jury to consider it in the case before it.[14]

First, the Commonwealth proffered sufficient evidence as a preliminary matter to prove to a reasonable person that Dooley and his wife had been committing time fraud. Dooley himself admitted in his opening statement that the two had committed time fraud for about a month before the murder, namely that both of the Dooleys were being clocked in while only Dooley showed for work.[15]

---

[14] KRE 104(a).

[15] Dooley argues that he made this admission because he had "no choice" after the trial court denied his motion in limine to exclude the evidence. Dooley argues that he was pushed into a corner of admitting to the time fraud, and he would not have brought it up if the prosecution had not. To the contrary, Dooley still had a choice. Admitting to the time fraud was probably a strategy to mitigate the force of the prosecution's inevitable presentation of those facts. But as we reason below, the trial court properly admitted evidence of the time fraud anyway, so Dooley's admission to the crime was an admission nonetheless, laying a sufficient foundation to support the motive theory under KRE 104(b).

While the other employees' timecards were found on or near Mockbee's person, the Dooleys' time cards were the only time cards not found with the rest. The Commonwealth argues this gives the Dooleys' time cards special probative value under its theory. Dooley counterargues this circumstance has the benign explanation that the Dooleys' payroll was done on an alternating weekly basis with the other employees, that Mockbee would not be expected to pick up the Dooleys' time cards until the following week. Whatever the case may be, Dooley's admission to the time fraud is for our purposes sufficient on its own to establish the relevance of this evidence. The true reason the Dooleys' timecards were missing was for the jury to infer and its significance was for the jury to weigh.

6

Second, Dooley asserts that the Commonwealth's motive theory depends upon actual proof that Mockbee knew about the time fraud and that Dooley specifically anticipated repercussions. We disagree. Neither is necessary for the motive theory to be plausible. The motivation to kill Mockbee, although an action disproportionate to the consequences of the months-long time fraud, existed even if Mockbee had not yet uncovered the fraud and even if Dooley had not yet been confronted about it because Dooley could have anticipated and feared that eventual outcome. Time fraud, depending on the amount of money obtained over the course of the previous month, is a form of criminal theft that could have exposed Dooley and his wife not only to termination but perhaps serious criminal charges and incarceration.[16] Dooley might have thought he could avoid this outcome if he killed Mockbee, effectively concealing a possible felony.[17] That was the Commonwealth's theory, anyway. This theory does not depend on Mockbee's actual discovery or pending disciplinary action by TFS. Any question about the plausibility of this theory is left to the jury, not the Court.

Finally, the time fraud was relevant to motivation and, therefore, at the same time, identity, both of which are non-propensity evidentiary purposes under KRE 404(b). A defendant's motivation to commit the murder is often an

---

[16] Time fraud would seem to fall under Kentucky Revised Statutes (KRS) 514.030, "Theft by unlawful taking or disposition." *See* KRS 514.030, 1974 commentary; Leslie W. Abramson, Ky. Prac. Substantive Crim. L. § 6:20, "Definitions" (Theft and Related Offenses).

[17] KRS 514.030(2)(d) (Class D felony for theft of property over $500 and less than $10,000).

important issue in criminal trials, perhaps especially in cases like this, where the identity of the perpetrator is disputed and must be proven almost entirely by circumstantial evidence. In such cases, proof of a defendant's motivation could be the lynchpin of the prosecution's theory. Motivation and identity thus become the independent, non-propensity bases for offering the evidence, so proof should be allowed, even if the evidentiary foundation depends on speculation to some extent.[18] Where the Commonwealth's motive theory is at least coherent, it is in effect a state-of-mind issue, properly left for the jury to believe or disbelieve.[19]

The trial court did not abuse its discretion by finding the evidence of time fraud was not unfairly prejudicial under KRE 403. While the Commonwealth may have spent approximately thirteen minutes of the trial presenting evidence by PowerPoint of the extent of Dooley's time fraud, that detail and emphasis was proportional to the degree to which Dooley could have been theoretically motivated to keep it all concealed. The greater the extent of his fraud, the greater an anticipated repercussion might be, and thus the more motivated he would presumably be to take extraordinary action to conceal it. Further, the fraud itself was not a violent crime, unlike the crime charged. It was, therefore,

---

[18] Motive is often speculated, short of being admitted. *Cook's Adm'r v. Bank Josephine*, 191 S.W.2d 209, 211 (Ky. 1945) ("When there is a question of whether or not a person has done an act, any fact which supplies a motive, or constitutes a preparation for the act or any subsequent conduct having a direct bearing on the act, may be proven.").

[19] *See Brainard v. Commonwealth*, 551 S.W.2d 829, 831 (Ky. 1977) ("[T]he prosecution is given wide latitude in ascertaining the motive that actuated the commission of the crime charged."); *Brafman v. Commonwealth*, 612 S.W.3d 850, 858 (Ky. 2020).

8

presumably much less likely to make the jury believe unfairly that Dooley was predisposed to commit murder simply because he committed a form of fraud or theft.

For the foregoing reasons, we cannot say that the trial court abused its discretion when it ruled this evidence sufficiently probative when weighed against its prejudicial effect. Accordingly, we find no error in the trial court's admission of evidence of Dooley's time fraud.

**B. The trial court's admission of certain tangible evidence.**

The trial court admitted into evidence three different tangible items, all over objection: a red knife and latex gloves, both found in a search of Dooley's truck months after the murder, and a container of industrial bleach found in fellow employee Ed Yuska's office. Dooley raises the same arguments in opposition to the admission of all three items: the Commonwealth failed to offer sufficient foundational evidence of their relevance and the trial court erred by admitting them. In other words, Dooley argues a reasonable jury could not infer in the first place that these items were connected to the murder at all, even under the theory urged by the Commonwealth. This issue of admissibility was preserved as to all three items, so we review them for abuse of discretion.[20]

---

[20] Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 11.00[2][d] (LexisNexis Matthew Bender) (2020) (hereinafter cited as "Lawson") (citing *U.S. v. Edwards*, 235 F.3d 1173 (9th Cir. 2000); *U.S. v. Ricco*, 52 F.3d 58 (4th Cir. 1995)).

### 1. *Admitting the red knife and latex gloves found in Dooley's truck was error, but these errors were harmless.*

The trial court allowed introduction of four different knives of Dooley's. One of them, a red, Husky, flip-blade knife was seized from his truck four months after the murder. No blood or DNA analysis was conducted on this knife specifically linking it to the murder, and the Commonwealth did not argue specifically that it was used to murder Mockbee. Rather, the Commonwealth introduced an assortment of knives collected from the premises, three of which were Dooley's. In the same search of Dooley's truck, investigators found latex gloves, which the Commonwealth also introduced in evidence. No forensic testing was done on the gloves, either.

All evidence must have a foundation that establishes its relevance, as previously discussed. Under KRE 104 and 901, the Commonwealth must prove a close enough connection between the proffered item and the crime charged.[21] The Court in *Higgins v. Commonwealth*[22] stated the requirement well:

> "It should also appear from the evidence that [the purported murder weapon] was found at a time and place furnishing reasonable ground to connect it in some way with the homicide. The proof need not positively show the connection; but there must be proof

---

[21] *See* KRE 901; Lawson, § 11.00[2] ("As a prerequisite to admissibility, the proffering party must identify the exhibit by showing that the information it contains or otherwise reveals is relevant to the pertinent factual issues. Thus, . . . a baggie of cocaine may be relevant in a prosecution for possession with intent to distribute, if the prosecution is able to show that the *specific* baggie in question is the *same* baggie found in the defendant's possession when he or she was arrested and that it has not been tampered with in any way *since* it was seized from the defendant.") (emphasis added) (citing 5 McLaughlin, *Weinstein's Federal Evidence*, 901.02[1] (2d ed. 2013)).

[22] 134 S.W. 1135 (Ky. 1911). Most of the Kentucky case law on identification of real evidence, including *Higgins*, predates the adoption of KRE 901 but continues, of course, to provide "very good guidance" on application of the requirement. Lawson, § 11.00[2][b].

rendering the inference reasonable or probable from its nearness in time and place or other circumstances."[23]

Consistent with *Higgins,* this Court has since held that alleged murder weapons and criminal instrumentalities must be demonstrably connected to the crime at hand or they are not admissible.[24]

Testimony of direct observation of an item in connection to the crime can establish this foundational relevancy.[25] But in cases like this with apparently no direct evidence or observation of an item's criminal connection, foundational relevancy can and must be established circumstantially. For example, if the instrumentality is found at the scene of the offense soon after the crime was committed and was capable of inflicting the type of injury sustained by the victim, it may be admitted for purposes of identification.[26]

In *Barth v. Commonwealth,*[27] the trial court admitted wooden sticks for identification as weapons used to assault the victim. Although the victim was blindfolded while he was beaten, the trial court properly admitted wooden sticks found inside the residence where the assault happened, found immediately after the assault occurred, and matched the shape of welts on the victim's back.[28]

---

[23] *Higgins*, at 1138.

[24] *Bartley v. Commonwealth*, 445 S.W.3d 1, 18 (Ky. 2014) (citing *Major v. Commonwealth*, 177 S.W.3d 700, 710 (Ky. 2005)).

[25] KRE 901(b)(1). *E.g., Beason v. Commonwealth*, 548 S.W.2d 835, 837 (Ky. 1977) (in a case charging defendant with illegally carrying a concealed deadly weapon, trial court admitted firearm for identification purposes after officer testified to seeing defendant drop the firearm to his side when the officer approached).

[26] *Major*, at 710 (citing *Barth v. Commonwealth*, 80 S.W.3d 390 (Ky. 2001)).

[27] 80 S.W.3d 390.

[28] *Id.* at 402.

11

These three factors—time, place, and circumstance—connected the sticks to the crime, distinguishing them from just any blunt object,[29] warranting their admission for identification.[30]

By contrast, the circumstances connecting Dooley's red knife to the murder are limited, or at the very least remain general in nature: Mockbee had been stabbed and cut during the murder, Dooley was working at TFS at the time of the murder, and the knife in question was found in Dooley's vehicle in the TFS parking lot. But unlike in *Barth*, where the place, time, and circumstances converged to establish a strong and specific connection between the purported weapons and the crime, the facts in the present case hardly narrow down the knife as *the* one used against Mockbee.[31]

Rather, the red knife was found outside the warehouse in a vehicle located in the parking lot some distance from where Mockbee's body was found. Although Dooley's truck was eventually chosen to be searched as part of the police investigation, the truck can hardly be considered part of the "crime

---

[29] *But see Tarrence v. Commonwealth*, 265 S.W.2d 40, 49 (Ky. 1953) (holding a tire iron admissible for identification as a murder weapon where the victim had been struck in the head multiple times with "a blunt object of some kind" and a coroner's opinion was that "it was possible" it was the murder weapon, although the tire iron was not found near the crime scene and there was no physical indication of its use). Note: The *Tarrence* court gave little explanation for its positive conclusion of relevance, in light of *Higgins*, providing only a single-line conclusion. *See id.* But it apparently distinguished the circumstance in *Tarrence* from Tarrence's cited authorities, finding those cases involved too speculative a connection between the items offered and the pertinent crimes.

[30] *Id.*

[31] "Specific facts, not black letter rules, govern identification issues." Lawson, § 11.00[2][d](1) (citing *Grundy*, at 80).

scene" in any meaningful sense of that term.[32]  Crucially, the knife was found

nearly four months later, long after the victim's body was presumably removed

from the premises and the initial search had been conducted.  The blade of this

knife was not analyzed or compared, whether by autopsy or other forensic

analysis, for a possible match with Mockbee's wounds.  The place, time, and

circumstances thus provide no specific connection between the knife and the

murder.

A nearly identical analysis applies to the latex gloves found in Dooley's

truck at the same time.[33]  In some ways, the admission of the gloves is perhaps

more troublesome than admission of the red knife because, as Dooley points

out, the only foundation the Commonwealth offered to admit the gloves was the

*lack* of a perpetrator's DNA at the scene, i.e., the absence of evidence.[34]  There

were no latex gloves or other specific indications of their use found near the

scene of the crime,[35] and nothing about the gloves themselves or the box that

contained them indicated their use in Mockbee's murder.  The mere lack of the

---

[32] At the very least, it is not closely connected to the "crime scene" for purposes of identification under KRE 901, even if investigators branch out to investigate other spaces.

[33] The Commonwealth's foundation is premised on an inference that the perpetrator was wearing latex gloves because limited DNA evidence was found.  In every other respect, the latex gloves have a similarly tenuous connection to the murder as the red knife does.

[34] Dooley's DNA was matched with the bag over Mockbee's head, which at least proves he likely touched it at some point.  But otherwise his DNA was not found.

[35] *See, e.g., Agatheas v. State*, 77 So.3d 1232, 1241 (Fla. 2011) (holding in error the admission of latex gloves found in a defendant's backpack pursuant to his arrest five years after a murder, even though similar gloves were found discarded along a path the defendant was thought to have taken that same night).

defendant's DNA at the scene does not indicate the use of latex gloves. Without some other affirmative reason to think the defendant wore gloves during commission, the absence of DNA cannot be sufficient grounds to admit the latex gloves in this case. There are far too many reasons why DNA might not be present at the scene other than the use of latex gloves.

Under such facts, Dooley makes a convincing argument that the red knife and latex gloves lack a clear, specific connection to this murder. As we have said recently, the trial court may only admit what a reasonable juror could find was *the* smoking gun, so to speak, not just *any* gun or even just any *smoking* gun.[36] The identification of an alleged weapon does not have to be proven with absolute certainty as a preliminary matter, and the trial court has broad discretion on these preliminary relevance matters.[37] But more is required than mere assertion of relevance by the Commonwealth. Here, the relevance objections Dooley raises are fair. The Commonwealth proffered too little foundational evidence to support the relevance of these tangible items as a preliminary matter. The trial court abused its discretion in overruling Dooley's objection.

Admitting the knife and latex gloves was trial-court error. But we find it was harmless error. We cautiously conclude that the prejudicial effect of

---

[36] *See Brafman,* 612 S.W.3d at 867, n. 64.

[37] *See* KRE 401; *Grundy v. Commonwealth*, 25 S.W.3d 76, 80 (Ky. 2000) ("We grant trial courts wide discretion over issues relating to the admissibility of tangible evidence because the foundation sufficient for admissibility will vary based on the nature of the item.").

admitting these items could be adequately addressed through cross-examination and, as discussed during a bench conference at trial, these foundational issues were ready fodder for cross-examination.[38]  The points of attack would be obvious to Dooley's capable defense counsel, would require little if any preparation to address, and could be brought to the jury's attention without confusion or significant detour.  With cross-examination, we can trust the jury accounted for the tenuousness of the connection between the items and the murder, and that the jury heard Dooley's innocuous, job-related explanation for having the knife and gloves in his truck.  Because of the opportunity to cross-examine the introducing witnesses, if not for any other reason, we find the error was harmless and did not affect the outcome.

### 2.  *Admitting the bleach found in Ed Yuska's office was not an abuse of discretion.*

Industrial bleach was found in TFS employee Ed Yuska's office, which the Commonwealth said it wanted to introduce into evidence to prove the thoroughness of its investigation.  Dooley claims this reason is pretextual: that the real reason was to introduce cumulative evidence of Dooley's access to bleach and to suggest its use in the crime.

---

[38] We say "cautiously" because physical evidence is generally thought to have a greater potential to produce unfair prejudice under KRE 403 than non-physical evidence like testimony.  Lawson, § 11.00[4] ("For good reason, tangible items of evidence are believed by many authorities to have extraordinary potential for prejudice, *especially in criminal cases*.  They are marked as exhibits, move into the jury room for use in deliberations, and have the potential to 'speak' louder and clearer than testimony delivered by witnesses and left in the courtroom . . . . 'The powerful and possible unwarranted impact that real proof may have on a trier of fact requires that special care be taken in considering its admissibility under Rule 403.'") (emphasis added) (quoting 2 McLaughlin, *Weinstein's Federal Evidence* § 403.07[2] (2d ed. 2013)).

15

Unusual circumstances that morning made the use of bleach relevant. There was an unusually strong smell of and positive test for industrial bleach in the janitor's closet just after the murder. That same morning, the employees noticed a lack of a strong bleach smell typically found in the break room after Dooley's morning cleanings. The presence or absence of the order of bleach was relevant in this case. The bleach in Yuska's office was relevant because Dooley had access to that office and the office was near the location of the murder. Thus, the time, place, and circumstances satisfy the identification requirements of KRE 901. It was then up to the jury to consider or disregard the bleach as evidence against Dooley. The trial court did not abuse its discretion in admitting this bleach.

## C. Witness Chris Black's pre-testimony interaction with the police, alleged to be in violation of KRE 615.

Chris Black was a witness called by the Commonwealth at trial. Black, a friend of the murder victim's husband, was investigated by police as a possible suspect. The police ultimately dropped their investigation of Black, and the Commonwealth brought charges against Dooley instead.[39] Before Black was called to testify, the murder victim's husband had just testified to explain why

---

[39] Several circumstances made Black a person of interest to police with respect to this murder. In particular, Black received $10,000 directly from Mr. Mockbee several months after the murder, which was inconsistently explained as a gift (Mr. Mockbee's testimony) and a loan (Black's testimony). Both men worked at TFS, and Mr. Mockbee authorized Black to take the day off from work the day of the murder. Later, Mr. Mockbee received a substantial life insurance payment at a time of serious financial trouble for the Mockbees. With these facts, investigators initially took an interest in both Black and Mr. Mockbee, suspecting there may have been a paid arrangement to murder Mockbee for insurance proceeds. Both parties denied this. Apparently, the investigation was dropped.

16

he gave Black $10,000 after the murder and gave Black the day off on the day of the murder. The husband explained that the money was simply a gift to a friend.[40] According to Dooley, the Commonwealth subpoenaed Black to corroborate this testimony.

While serving the subpoena, the officer told Black that Dooley in his opening statement at trial accused Black of committing murder for hire. Dooley claims that this tip from the officer impermissibly alerted Black of the need to shape his trial testimony. Dooley argues this violated KRE 615, which requires trial judges to sequester certain witnesses. While Dooley does not allege the officer's tip violated the black letter of KRE 615, he asserts it violated the "spirit" of that rule since Black, then a prospective witness for the Commonwealth, was exposed to the substance of Dooley's defense before he took the stand. In effect, Dooley claims the Commonwealth's Attorney improperly, at least indirectly through the officer, also an agent of the state, influenced Black's testimony to help him eliminate himself as an alternate perpetrator.

KRE 615 generally makes the sequestration of witnesses mandatory when a party requests it.[41] This sequestration is meant to preserve the authenticity of a prospective witness's testimony by preventing influence, even if subtle and subconscious, of one witness's testimony on a prospective witness's

---

[40] The Blacks, however, later testified this was a friendly loan to alleviate some of their financial problems.

[41] *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky. 2012).

17

testimony.[42]  Trial counsel may confer with their witnesses for certain purposes, such as basic preparation, but for counsel to relay previous testimony to prospective witness would be to violate the rule.[43]  While violations of KRE 615 at trial, inside the courtroom, are obviously issues we may resolve, this Court has also entertained the possibility of violation of the "spirit" of this rule,[44] demonstrating the possibility of witness contamination inside and outside the courtroom.  The issue was preserved at trial, so we review the trial court's handling of the alleged violation for abuse of discretion.

Although the rule itself is silent as to remedies for violation, most reported cases present three avenues of remedy: (1) preemptively exclude the allegedly contaminated testimony; (2) permit the testimony notwithstanding a violation and allow the testimony subject to impeachment and probing cross-examination regarding the alleged contamination; and (3) reverse on appeal, if so required.[45]

---

[42] *See id.* at 112–13 ("The rationale behind the rule is the recognition that a witness who has heard the testimony of previous witnesses may be inclined, consciously or subconsciously, to tailor his testimony so that it conforms to the testimony given by other witnesses."); *Smith v. Miller,* 127 S.W.3d 644, 646 (Ky. 2004) (quoting *Speshiots v. Coclanes*, 224 S.W.2d 653, 656 (Ky. 1949)); *Reams v. Stutler*, 642 S.W.2d 586, 589 (Ky. 1982).

[43] *Miller*, 127 S.W.3d at 646.

[44] *E.g., id.* at 647; *Commonwealth, Dept. of Highways v. Riley*, 414 S.W.2d 883, 884–85 (Ky. 1967).

[45] *See Miller*, at 647 (citing Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 11.30[5] (4th ed. 2003)).  Professor Lawson's 2020 edition Handbook suggests it may be an open question as to whether KRE 615 addresses extra-courtroom contamination, or if it is confined solely to the courtroom.  Lawson, at §11.40[4][a] (citing *Hall v. Commonwealth*, 337 S.W.3d 595 (Ky. 2011) (examining but refusing to provide relief for an alleged violation that flowed from a witness's watching of a trial on closed circuit television while in jail); *Woodard v. Commonwealth*, 219 S.W.3d 723 (Ky. 2007) (seeming to suggest that violations of the Rule cannot be grounded on interactions outside the courtroom)[. *But see*] *Commonwealth v. Collins*, 933 S.W.2d 811 (Ky. 1996) (suggesting that the purpose of the rule might be subverted by actions

Notably, this Court has preferred the second remedy,[46] after holding a required hearing.[47]  In any case, a violation without prejudice would not entitle a party to any relief on appeal.[48]

This Court has previously addressed alleged extra-courtroom violations of KRE 615.  For example, in *Hall v. Commonwealth*,[49] two witnesses rode to trial in the same car, although they denied discussing their anticipated testimony. Despite this denial, Appellants sought a mistrial for violation of KRE 615, ultimately appealing the trial court's refusal.  The *Hall* Court acknowledged that since *Woodard v. Commonwealth*[50] it is possible the "spirit" of the rule may be violated outside the courtroom but found that the trial court did all that could be expected of it; therefore, the trial court did not abuse its discretion because it held a hearing on the possible extent of the alleged violation and allowed the witness to testify subject to cross-examination.[51]

---

occurring outside the courtroom)).  Professor Lawson's citations and explanatory parentheticals have here been borrowed directly, this Court having found his assessment of the authority accurate.

[46] *See* Lawson, § 11.40[3][a] (citing *Woodard*, 219 S.W.3d at 728–29 (referring to permitting the testimony subject to cross-examination as "the best course of action")). Total exclusion of the witness's testimony has been called a "draconian" measure and has the potential to conceal more truth than any falsity it may keep out and is for obvious pragmatic reasons usually preferable to total reversal or retrial.

[47] *Henson v. Commonwealth*, 812 S.W.2d 718, 723 (Ky. 1991) ("A hearing is required by a trial judge to determine whether the violation [of the separation order] caused prejudice to the defendant in addition to determining what the witness had heard or the content of his proposed testimony.").

[48] Lawson, § 11.40[3][a].

[49] 337 S.W.3d 595 (Ky. 2011).

[50] 219 S.W.3d 723 (Ky. 2007).

[51] *Hall,* at 615.

19

In *Commonwealth v. Collins*,[52] the Appellant claimed a police officer subject to a separation order violated the order by approaching defense witnesses after the trial had already begun and telling them the anticipated testimony of a witness for the Commonwealth.[53] The *Collins* Court also considered this out-of-court interaction between witnesses as a possible violation of KRE 615 but found it was "not enough to warrant reversal," even if "what transpired [] might have amounted to a technical violation of the separation order."[54] As in *Hall*, this Court affirmed the trial court's decision to hold a hearing on the violation and to, in its discretion, allow the witness to testify subject to cross-examination on the matter.

The facts pertaining to the issue in this case are somewhat like *Collins*. First, intentional cooperation of state actors to influence the testimony of witness against a criminal defendant is always a concern. Second, the clarity and authenticity of a witness is testimony in a case like this, where the defendant is being convicted by circumstantial evidence, is especially important.

Black was at one point being investigated as an alternate perpetrator. And the existence of a possible financial motive between Mr. Mockbee and Black made them initial persons of interest for a reason. The jury would have had an interest in hearing Black's untarnished testimony, just as the Commonwealth thought it was important to call him as a witness after presenting Mr.

---

[52] 933 S.W.2d 811 (Ky. 1996).

[53] *Id.* at 816.

[54] *Id.* at 817.

Mockbee's testimony. Black was not necessarily an ordinary fact witness. He was there in some sense to prove himself not to be the perpetrator, and in another sense to narrow the array of possible perpetrators down to Dooley. But whether and to what extent Black's testimony changed post-contamination is unknowable, and therefore the extent of prejudice is unknown.

Still, it seems Dooley's counsel became aware of the possible contamination before Black was called to testify. This gave Dooley the opportunity to raise the issue to the trial court. Upon motion, the trial court conducted a hearing regarding the manner and extent of alleged influence on Black. While the allegation is troubling, we cannot say that it was error to allow Black to testify subject to cross-examination and impeachment on this issue. Defense counsel might find cold comfort in this opportunity to impeach and cross-examine an allegedly contaminated witness, especially where a witness's testimony is directly relevant to the perpetrator's identity, but in this case we are satisfied it was adequate. Further, while Dooley asserts the officer's influence caused Black to testify more favorably for himself, it is hard to imagine how Black would not testify favorably for himself anyway. In other words, it is impossible to tell, as Dooley expressly concedes, how Black's testimony would have been different, because he would presumably not be inclined to admit to murder for hire in the first place. Accordingly, consistent with *Collins* and other applicable authority, we affirm the trial court, finding no abuse of discretion in allowing the testimony despite a possible violation of KRE 615.

21

## D. Denial of the missing-evidence instruction.

When the victim's body was found, a plastic restaurant carry-out bag was wrapped around the head. The investigators cut the bag into pieces when removing it from the head, and the bloodier fragment of the bag was apparently not collected for further investigation and was discarded. The collected fragment was then subject to DNA testing, but the abandoned piece was, of course, never tested. The tested fragment was positive for Dooley's DNA and used as evidence at trial.

The missing bag fragment prompted Dooley to seek and tender a missing-evidence instruction. The proffered instruction allowed the jury to infer that the missing piece of bag tended to exonerate Dooley, but it also conditioned that inference, in accordance with Kentucky law, on a finding that the Commonwealth destroyed or withheld the fragment in bad faith, particularly to withhold exculpatory evidence.[55] The trial court denied the requested instruction, finding no evidence of bad faith by the Commonwealth.

Dooley now raises essentially the same arguments on appeal as he did at trial that he was entitled to a missing-evidence instruction. But on appeal, Dooley also urges this Court to overturn precedent in our criminal law requiring proof the evidence was destroyed by the Commonwealth in bad faith. In

---

[55] Dooley's tendered missing-evidence instruction read:

"If you believe from the evidence that there existed the bottom of the bag found around Michelle Mockbee's head which was not tested for DNA and that agents or employees of the Commonwealth intentionally destroyed it, you may, but are not required to, infer that the bottom of the bag found around Michelle Mockbee's head which was not tested for DNA would be, if available, adverse to the Commonwealth and favorable to the Defendant."

22

particular, he argues that proving bad faith is an insurmountable feat. Further, and compellingly, Dooley points out that civil litigants only have to show that the opposing party had exclusive control over the evidence when it went missing and that the evidence is missing without explanation. This disparity is unjust, he argues, as much more is at stake for a criminal defendant such as himself than a civil litigant with respect to a financial or property interest.

We review the denial of instructions for abuse of discretion.[56] Since a constitutional due-process error is alleged, we will be compelled to reverse if we find such an error was not harmless beyond a reasonable doubt.[57]

A missing-evidence instruction is one way to cure an alleged violation of due process per *Brady v. Maryland*,[58] other than dismissal of the charge altogether or exclusion of the Commonwealth's evidence outright, the latter two being the more drastic remedies.[59] Entitlement to the instruction arises when purportedly exculpatory evidence was destroyed by the Commonwealth intentionally or inadvertently "outside of normal practices," or when such evidence was so significant and forever lost that it compromises the defendant's due-process right to a fair trial.[60] This standard, perhaps with minor modification, reflects the due-process standard established in *Arizona v.*

---

[56] *Bowen v. Commonwealth*, 605 S.W.3d 316, 319 (Ky. 2020).

[57] *Nunn*, 461 S.W.3d at 750.

[58] 373 U.S. 83 (1963).

[59] *Estep v. Commonwealth*, 64 S.W.3d 805, 809–10 (Ky. 2002).

[60] *Id.* (citing *Tamme v. Commonwealth*, 759 S.W.2d 51, 54 (Ky. 1988) and *Tinsley v. Jackson*, 771 S.W.2d 331, 332 (Ky. 1989)).

*Youngblood*,[61] which held the Due Process Clause was not implicated by "the failure of the State to preserve evidentiary material of which no more can be said then that it could have been subjected to tests, the results of which might have exonerated the defendant."[62]

Here, the state had the evidence available to it during its investigation, having separated it from the cleaner part of the bag later admitted into evidence. Disposing of the bloodier piece was admittedly a "mistake," at least according to an investigator's testimony. This would seem to make the disposal of that piece arguably "outside of normal practices," assuming mistakes are not a normal practice of police investigators.

However, the record evidence is that the only DNA found on part of that same article, the bag, was Dooley's and Mockbee's. There is no apparent indication that someone else's DNA would be present on the same bag to exculpate Dooley. Ultimately, as at trial, Dooley's fundamental assertion is that the missing bag fragment *could* have been subject to DNA analysis and that this DNA analysis *could* have had some exculpating effect, despite the tested part's clearly incriminatory effect. This hypothetical exculpating force is not enough under *Youngblood* or the Kentucky precedent that has since developed.[63] So Dooley was not entitled to a missing-evidence instruction as a matter of due

---

[61] 488 U.S. 51 (1988).

[62] *Id.* at 57.

[63] *See id.*

process based on hypothetical exculpating potential.[64]  The trial court did not abuse its discretion by declining the missing-evidence instruction.  There was no error here.

The Court recognizes it may soon be appropriate to reflect on the burden of proof criminal defendants sometimes bear under *Youngblood* and acknowledges that some authorities are critical of the current standard.  The burden of proving bad faith is quite difficult to carry, and our historical imposition of a higher burden on criminal defendants than civil litigants is more than curious.  But, finding no reversible error, we must decline the invitation to modify our settled precedent.  Dooley was not in this case clearly entitled to the instruction, so the facts and issues presented on appeal would offer a poor foundation for such a change.

### E. Whether Appellant is entitled to a new trial for cumulative error.

Finally, Dooley claims that if the asserted errors do not individually warrant reversal, then the cumulative effect of the errors requires reversal. Under the cumulative error doctrine, when the cumulative effect of multiple

---

[64] This contrasts with the issue of missing video footage in Dooley's first trial on the present indictment.  Before Dooley's first trial, surveillance footage in the Commonwealth's possession was not turned over to Dooley.  This footage showed an unknown individual on TFS property that day.  Because this footage was not turned over to the defense before the first trial and tended to have exonerating potential, the trial court granted CR 60.02 relief, set aside the judgment following the first trial, and ordered a new trial, which is the case at hand.  Dooley now compares the missing bag fragment to the Commonwealth's failure to furnish the footage to demonstrate that the missing piece was also withheld, either intentionally or in gross negligence, because of its alleged exonerating effect.  The missing-footage issue was not an issue in the second trial, and Dooley's argument does not persuade us that the two matters are related.

25

errors renders the trial fundamentally unfair, reversal may be appropriate, even if identified errors would not individually support reversal.[65]

The only error in this case was the trial court's admission of Dooley's red knife and the latex gloves. We determined these errors were harmless. The sum of two harmless errors cannot equal prejudicial error.[66] And though it was likely improper for the officer who delivered the subpoena to tip off Chris Black about Dooley's alt-perp theory of defense, the trial court's remedy was adequate. We cannot say that these errors together rendered this trial fundamentally unfair, so we will not reverse for cumulative error.


## IV. CONCLUSION

For the reasons stated, we affirm the judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Jared Travis Bewley
Erin Hoffman Yang
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Leilani Karin Marie Martin
Assistant Attorney General

---

[65] *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

[66] *Id.* (citing *Furnish v. Commonwealth*, 95 S.W.3d 34 (Ky. 2002)).